Robert W. BLANCHETTE et al., Plaintiffs,·

v.

PROVIDENCE AND WORCESTER COMPANY, a Delaware Corporation,·et al., Defendants.

Civ. A. No. 76–411.

United States District Court, D. Delaware.

Jan. 17, 1977.

Bruce M. Stargatt, Jack B. Jacobs and Richard A. Levine, Young, Conaway, Stargatt & Taylor, Wilmington, Del., for plaintiffs; Edwin K. Taylor, Philadelphia, Pa., and Dennis J. Roberts, II, Roberts & Willey, Inc., Providence, R. I., of counsel.

Edmund N. Carpenter, II, Richards, Layton & Finger, Wilmington, Del., for defendants; Peter B. Archie, Peabody, Rivlin, Lambert & Meyers and John L. Richardson, Verner, Liipfert, Bernhard, McPherson & Alexander, Washington, D. C., of counsel.

## OPINION

STEEL, Senior District Judge:

█ The Court has before it a motion of plaintiffs ("Trustees") to preliminarily enjoin the defendants, P & W Industries, Inc. ("Corporation"), Providence and Worcester Company ("Railroad"), together with named individuals who are their officers and directors, from soliciting the tender of Railroad shares in exchange for Corporation shares. The Exchange Offer was embodied in a Prospectus dated November 8, 1976, which Corporation issued to Railroad stockholders. This was accompanied by a letter from Eder, the president of Railroad. In addition the stockholders of Railroad were sent a proxy, with supplemental information relating to it, for use at a stockholders meeting, if one were held, to amend the Certificate of Incorporation of Railroad. These documents must satisfy the disclosure requirements of section 14(e) of the

Securities Exchange Act of 1934 ("Act") which under section 14(d) is applicable to the Exchange Offer.

The motion was initially presented orally with supporting and opposing briefs on December 17, 1976. The record included the verified complaint, answer, affidavits, depositions, and documents. During the argument the Court expressed concern whether the tender material adequately disclosed the voting rights which the Railroad shareholders possessed and the effect which an exchange would have upon those rights. At the conclusion of the argument defendants sought and later obtained leave to have Corporation send to the Railroad stockholders a letter to supplement the Prospectus. Defendants invited plaintiffs to send any informational communication to the Railroad stockholders which they wished but plaintiffs have not done so. The supplemental letter of Corporation was mailed on December 24, 1976.[1] It made certain statements on the subject of the voting rights of the Railroad stockholders and the effect which the exchange would have upon them. In addition it called attention of the Railroad stockholders to the interest which the directors of Corporation had in recommending the exchange in order that the stockholders might evaluate that interest in considering the recommendation. The supplemental letter likewise called the stockholders' attention to certain alleged deficiencies (denied by defendants) which plaintiffs claimed existed in the Prospectus and stated that shares of Railroad which stockholders had previously tendered could be withdrawn by communications received prior to January 24, 1977, the earliest time that the Exchange Offer could be declared effective. As of January 5, 1977, of the 35,000 shares outstanding, 18,702 shares had been tendered and none had been withdrawn.

Because of the mailing of the supplemental letter a further hearing was held on January 6, 1977. The pending motion is to

---

1. The letter was mailed without objection by plaintiffs with the understanding by plaintiffs and by the Court that neither were approving nor disapproving the form or contents of the letter or determining its significance in the resolution of the pending issues.

be decided on the "total mix" of the Prospectus, the materials which accompanied it, and the supplemental letter of December 24, 1976. After having considered all of them, the Court has concluded that a preliminary injunction should issue and makes the following findings of fact and conclusions of law:

Plaintiffs are trustees of the property of Penn Central Transportation Company ("PCTC"), a debtor in reorganization in the United States District Court for the Eastern District of Pennsylvania pursuant to section 77 of the Bankruptcy Act, 11 U.S.C. § 205. On December 31, 1968, in connection with a merger with the New York, New Haven and Hartford Railroad, PCTC acquired 9,551 of the total of 35,000 shares of a railroad incorporated in 1844 by special legislative charter in the states of Massachusetts and Rhode Island ("Old Railroad").

Railroad, the defendant, is a Delaware corporation with its principal place of business in East Providence, Rhode Island. It is the corporate successor of Old Railroad. Corporation, the defendant, is a Rhode Island corporation with its principal place of business in East Providence, Rhode Island. The defendants, Robert H. Eder, Raymond D. Finizia, Ernest Malo, Joseph R. DiStefano, Morris E. Laird, William M. Lese, Antonio Asquino, Charles Luna, and Pierre R. Bretey, are, and at the time of the Exchange Offer were, officers and directors of both Railroad and Corporation.

Jurisdiction exists under section 27 of the Act.

Railroad is a publicly held corporation which operates a railroad in Rhode Island, central Massachusetts and eastern Connecticut. It presently has issued and outstanding 35,000 shares of $100 per value common stock. These securities (which constitute the only class of Railroad's securities) are registered with the Securities and Exchange Commission ("Commission") pursuant to 15 U.S.C. § 78*l*, are traded over the counter, and are held by approximately 600 shareholders located across the United States. Railroad's largest single shareholder is plaintiffs, whose ownership of 9,551 shares as trustees of PCTC gives them approximately 28 percent of Railroad's common stock.

Since 1844, the Charter of Old Railroad contained a provision for "scale voting".[2] Rather than providing that each share should have one vote, the Charter allocated voting rights as follows: one vote for each share held up to 50 shares, and one vote for each additional 20 shares held in excess of 50 shares, with the limitation that no shareholder could vote more than one-fourth of the whole number of Railroad's issued and outstanding shares except as a proxy for other shareholders.

The defendant Railroad was created under Delaware law for the purpose of merging with Old Railroad. The merger took place in 1969 and Railroad is the surviving corporation. Article Ninth of its Certificate of Incorporation contained scale voting provisions identical with those of Old Railroad as well as for a staggered board of directors.

On July 6, 1972, Railroad's management convened a special stockholders' meeting to amend Article Ninth of its charter so as to raise the number of authorized shares from 70,000 to 1,400,000. Under the proposed amendment, the scale voting would be retained with a shareholder's first 1,000 shares being fully votable, with 20 votes for each 400 shares above 1,000, subject to the provision that no shareholder would be entitled to vote upon more than one-fourth part of the whole number of shares issued and outstanding, except as a proxy. The voting rights were proportionately the same as those of Old Railroad. Plaintiffs voted against the proposed amendment.

Before the amendment became effective[3] plaintiffs filed an action on October 10, 1972, against Railroad in the Court of Chan-

---

2. This is a name chosen by the Court for convenience.

3. The amendment did not immediately take effect due to the need for Interstate Commerce Commission approval.

cery of Delaware seeking (i) an order declaring that Article Ninth of Railroad's charter violated the General Corporation Law of Delaware, and that each shareholder who owned stock was lawfully entitled to one vote per share without qualification, and (ii) an order enjoining the filing of the proposed amendment to the Railroad's charter.

On July 30, 1976, the Delaware Court of Chancery (The Honorable William T. Quillen) filed an opinion and order which (1) held to be void *ab initio* the scale voting provisions of Article Ninth, (2) permanently enjoined the filing of the amendment, and (3) ordered that henceforth the voting of Railroad shares would be on the basis of one share one vote. *Baker v. Providence & Worcester Co.*, Del.Ch., 364 A.2d 838 (1976).

On August 17, 1976, Railroad appealed to the Supreme Court of Delaware from the July 30, 1976, opinion and order of the Court of Chancery. No stay of the Chancery order was applied for or entered. Railroad's appeal is still pending.

Aware that under the July 30, 1976, decision the plaintiffs had 28 percent of the voting rights of Railroad, Eder, the president of Railroad and Corporation, promptly sought to eliminate those rights. Almost immediately the directors decided to proceed with the Exchange Offer which is the subject of this action. The vehicle which the directors selected to make the offer was Corporation. It had been formed by Railroad under the name of Eastern Securities Inc. in 1969, with a special legislatively enacted Rhode Island charter which contained provisions for scale voting. It has been a wholly-owned inactive subsidiary of Railroad with no assets other than $3,500 of capitalized organizational expense. Its officers and directors were and are identical with those of Railroad. As a step preliminary to making the Exchange Offer the charter of Eastern Securities Inc. was amended to increase its capitalization from 35,000 to 700,000 authorized shares and its name was changed to that of the defendant,

P & W Industries, Inc. ("Corporation").[4] The shares of Corporation were then registered under the Securities Act of 1933.

The exchange which Corporation is offering to stockholders of Railroad is 20 shares of stock of Corporation for each one share of Railroad. If 51.1 percent of the stock of Railroad were tendered Corporation would be obligated to accept them, but it may in its discretion accept shares of less than 51.1 percent. If tenders are accepted Corporation will own stock of Railroad with each share having one vote. The stockholders of Railroad who exchange their shares will receive shares of Corporation having scale voting. The effect of the Exchange Offer, if accepted, will be substantially to disenfranchise all stockholders of Railroad who hold more than 50 shares.

The Prospectus states that the directors unanimously consider the terms of the offer to be fair and equitable and recommend its acceptance. The Prospectus was accompanied by a letter dated November 7, 1976, from Eder, as president of Railroad, which likewise recommends that the stockholders exchange their shares, stating that the officers and directors of Railroad believe an exchange is in the best interest of the stockholders.

The question presented by the pending motion is not whether the Exchange Offer is fair and equitable, but whether the totality of the materials which the defendants sent to the Railroad stockholders meets the requirements of section 14(e) of the Act. Section 14(e) provides:

"It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in

4. In order to effect the transaction, the shares of Corporation held by Railroad were transferred to defendant Joseph DiStefano. (Complaint, Exhibit "B", p. 19).

opposition to or in favor of any such offer, request, or invitation."

■ Although plaintiffs have not accepted the Exchange Offer, nonetheless they have standing to attack it. *Electronic Speciality Co. v. International Controls Corp.,* 409 F.2d 937, 946 (2d Cir. 1969).

### Disclosures Re Voting Rights

At the outset the Prospectus purports to summarize its contents and states (p. 3.):

"*Effects of The Exchange Offer*

Corporation shares received in the exchange will be subject to protective voting provisions similar to those presently applicable to outstanding Railroad shares." [5]

■ This statement was untrue. It would have been true if the Court of Chancery had not rendered its decision of July 30, 1976. Under this decision, however, the "protective voting provisions" in the Certificate of Incorporation of Railroad were invalidated and each share of Railroad stock was deemed entitled to one vote.

Again, at page 51 of the Prospectus under the caption "SHAREHOLDERS OF RAILROAD", it is stated:

"Under Railroad's Certificate of Incorporation, each shareholder has one vote for every share held not exceeding fifty shares, and one vote for every twenty shares more than fifty held. However, no shareholder is permitted to vote upon more than one-fourth of the whole number of shares outstanding unless as proxy for other shareholders."

While this statement is literally true, as the defendants have argued, since it refers to the terms of the Certificate of Incorporation, it is highly misleading. The scale voting provisions in the Certificate of Incorporation were held to be invalid by the Court of Chancery three months before the Pro-

spectus was issued, and that decision has not been stayed nor reversed.

■ It was not until the next to the last page of the Prospectus, in a note to the consolidated financial statements of Railroad that the Railroad stockholders were told for the first time that pursuant to the Chancery decision each share of their stock was entitled to one vote.[6] This was information which was important for the stockholders to have in deciding whether to accept the tender offer. Being information which was buried it did not satisfy the clarity of disclosure which the Act requires. See *Gould v. American-Hawaiian Steamship Co.,* 331 F.Supp. 981, 995 (D.Del.1971), *affirmed in relevant part,* 535 F.2d 761, 774 (3d Cir. 1976), and *National Home Products, Inc. v. Gray,* 416 F.Supp. 1293, 1316 (D.Del. 1976).

Nor are the disclosure requirements of the Act satisfied by the letter dated August 5, 1976, or the footnotes in the sixth and ninth month financial statements of Railroad (Doc. 37, Exhibits 4, 5 and 6) which revealed that under the Chancery decision stockholders of Railroad were entitled to one vote for each share held. It was important for the Railroad stockholders to be informed of this at the time the tender offer was made.

■ The false and omitted statements in the Prospectus concerning the voting rights of the Railroad stockholders were material. There was a substantial likelihood that a reasonable shareholder would consider it important to know of his true voting rights in deciding whether to tender his shares. Compare, *TSC Industries v. Northway,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

Defendants deny that the Prospectus failed to adequately describe the voting rights of the Railroad stockholders. They argue that if it did, the deficiency was

---

5. The phrase "protective voting provisions" was chosen by defendants.

6. The Chancery decision is referred to in a footnote in the Prospectus on page 4 without any indication what the decision held except for a cross reference to the order "described

herein". On page 7 the Prospectus states that the Chancery decision invalidated the "protective voting provisions" without referring to the fact that it also held that each holder of Railroad stock was entitled to one vote.

cured by the letter which Eder sent to stockholders on December 24, 1976. It stated:

> "*Reduction of Voting Rights.* At present, because of the Delaware Chancery Court decision, all Railroad shareholders have a right to vote on a 'one-share-one vote' basis; tendering shareholders will give up 'one-for-one voting' as to Railroad shares in excess of 50 because of the Protective Voting Provisions of Corporation;"

The letter accurately described the voting rights which Railroad stockholders now have and the effect which the exchange would have upon holders of more than 50 shares.[7] The difficulty is that a fair reading of the Prospectus may have led stockholders to believe that their shares had scale voting rights and that these would not be disturbed if they made the exchange offered them. This could have been persuasive in prompting stockholders to exchange their shares. The statement in the December 24 letter was inconsistent with the voting rights disclosures in the Prospectus. Yet the letter failed to disavow the statement in the Prospectus or tell the stockholders that they should disregard it in determining whether to withdraw shares previously deposited.

In view of the crucial importance which voting rights have, both in determining how a corporation should be managed, and in determining the value of the shares, stockholders were entitled to have Corporation identify and correct all erroneous statements in the Prospectus. Instead, the stockholders of Railroad were left to determine which statements in the total mix were true and which as a result of the materially different disclosure in the December 24 letter could no longer be considered accurate. The importance of a complete disclosure which identified all previously made erroneous statements is enhanced in a case like this one where management controls not only the offeror corporation, but also the offeree corporation.

Where one group has complete access to all the relevant facts, where acceptance of the offer will be very much in its interest, and where, as a result, disclosure will be one-sided, management has a heavy burden to insure that disclosure is complete and non-misleading, especially with respect to shareholders whose interests may differ from their own. See discussion, infra, p. 355.

Only if stockholders were told that certain parts of the Prospectus were erroneous could they intelligently determine whether to withdraw their shares or leave them on deposit for exchange. The December 24 letter, without a disavowal of the accuracy of the statements in the Prospectus, could not adequately cure the erroneous and misleading statements which it contained.

### Reasons for the Exchange Offer

The Prospectus states on page 4:

> "There are two principal reasons for the Exchange Offer: (1) to facilitate diversification of corporate activities and (2) to clarify and preserve voting provisions applicable to Railroad since 1844."

Plaintiffs assert that the Prospectus is false and misleading in stating that a principal reason for the Exchange Offer is "to facilitate diversification of corporate activities", that this is not a principal reason for the offer but at most is one of minor significance compared with the principal reason, which is to avoid the effect of the July 30, 1976, Chancery decision.

The immediacy of the efforts of defendants after the Chancery decision to have the Prospectus prepared and present the tender offer to the Railroad stockholders is convincing proof that the tender was triggered by the decision. Eder, the president of Railroad, admits that the decision caused Railroad "to speed up" its efforts to create the proposed holding company structure. (Doc. 27, ¶ 21).

Eder maintains, however, that general plans and proposals to facilitate diversification into fields unrelated to Railroad opera-

---

7. The letter also set forth contentions of plaintiffs concerning the inadequacy of the disclo-sures with respect to voting rights and other matters.

tions had been under consideration for some years. He states that studies directed to accomplishing this through a holding company had preceded the Chancery decision for a considerable period. (Doc. 27). These statements stand unrebutted. They are not negated by the fact that the Exchange Offer probably was presented to the stockholders before it would have been had the Chancery decision not been handed down on July 30, 1976.

■ Despite the speed with which defendants acted after the decision, a desire to create a vehicle to facilitate diversification nevertheless was one of the reasons for the Exchange Offer being made and was one of the two important reasons. Whether it was of coordinate and equal importance with the intention to "clarify" the voting rights of the Railroad stockholders does not mean that it was not a "principal reason". The statement in the Prospectus did not constitute a material misstatement or omission within the standard of materiality laid down in *TSC Industries v. Northway, supra.*

The Prospectus was, however, false and misleading in attributing as a second reason for the Exchange Offer the need "to clarify and preserve voting provisions applicable to Railroad since 1844".

The Exchange Offer was not necessary to "clarify" voting rights of the Railroad stockholders. They were clear under the Chancery decision. The reason for the proposed exchange was to avoid testing the judicially declared one share-one vote rights of stockholders in the Supreme Court. If the inconsistency between the terms of the Railroad Certificate of Incorporation and the Chancery decision made it desirable for Railroad to eliminate the inconsistency, this could have been accomplished by an amendment to the Certificate of Incorporation which would provide that each share of stock should have one vote.

Furthermore, it was erroneous for the Prospectus to say that the purpose of the offer was to "preserve" voting provisions applicable to the Railroad since 1844. The purpose, accurately stated, was to "reestablish" those voting provisions which had been terminated by the Chancery decision of July 30, 1976. The use of the word "preserve" was especially misleading in view of the failure of the Prospectus to tell the stockholders in so many words that under the Chancery decision each share of stock, regardless of the number held, was entitled to one vote.

*The disclosure responsibility of defendants because of their personal interest in the success of the Exchange Offer and the dual relationship which they occupied*

The Prospectus read in its entirety, together with the supplemental letter of December 24, demonstrate that defendants deemed it important that the Exchange Offer succeed. The documents sent to stockholders were designed to persuade them to accept the offer. In furtherance of their objective the boards of directors of both Corporation and Railroad (which are in fact identical) recommended that the Exchange Offer be accepted. The extent of the directors' concern in the matter is manifest by the fact that broker dealers were to be paid $1.50 for each share which they caused to be exchanged, subject to a maximum payment of $1,500. This is not to suggest that the defendants did not honestly believe that the acceptance of the Exchange Offer would be in the best interest of the stockholders. While the defendants in the Prospectus recommended that the Railroad stockholders accept the Exchange Offer, they did not disclose in connection with the recommendation that the directors stood personally to gain by the acceptance of the offer. The benefits which defendants derived under the charter of Corporation were the staggered election of directors and the scale voting of stock of Corporation with the consequence that the removal of directors would be more difficult.[8] The rela-

---

**8.** The effect of the exchange upon voting rights would be dramatic. The Trustees who now hold 9,551 shares of Railroad stock are entitled to 28 percent of the voting rights of the company. If all of the Railroad shares were exchanged, plaintiffs would hold 3 percent of the

tionship between the recommendation and the personal interest of the directors was revealed for the first time in the letter of December 24, when the stockholders were told that they should evaluate the personal interest of the directors in determining whether to follow the recommendation. Although the stockholders were admonished to consider this fact in evaluating the directors' recommendation, this disclosure was diluted by the generally slanted way in which the Prospectus had presented the offer.

More often than not tender offers involve a contest between the offeror and the target company. This circumstance results in stockholders being told of the advantages and disadvantages of the tender. Arguments, pro and con, are presented to them by the contesting parties, thereby putting the stockholders in a position to make an informed judgment to accept or reject the offer. Not so in the instant case. Here the offeror, Corporation, and the target company, Railroad, are in effect the same, staffed as they are by identical directors and officers. The arguments which they presented to stockholders in favor of accepting the Exchange Offer were unilateral and not counterbalanced by opposing arguments.

■ Because of the uniqueness of the instant situation, defendants had a burden of disclosure which was more onerous than it would have been had a contest existed on the tender. This was emphasized in *Broder v. Dane*, 384 F.Supp. 1312, 1318–19 (S.D.N.Y.1974). There the Court recognized that an issuer making a tender offer for its own shares is "the most inside of insiders" and "the insider par excellence".

In the instant case the defendants were not only in a sense insiders but in their capacity as officers and directors of Railroad were fiduciaries for the stockholders. This imposed upon them the heavy responsibility of advising the stockholders fully and

impartially about the advantages and disadvantages of the tender, especially in view of the personal interest which the defendants had in the success of the offer.

This heavy burden of disclosure emphasizes the materiality of the misstatements and misleading omissions which have been previously pointed out. Other portions of the Prospectus likewise demonstrate its bias.

■ Throughout the Prospectus, and indeed in the supplemental letter, the shares of Corporation which the Railroad stockholders will receive if they accept the Exchange Offer are stated to have "protective voting provisions". This is a misnomer. Passing the question whether the scale voting provisions are always protective of the rights of holders of 50 shares or less, the provisions are clearly not protective of the rights of stockholders owning more than 50 shares. Actually, they deprive such persons of voting rights which they would otherwise have and prevent them from acting effectively to replace incumbent management if they believe that its retention is not in the best interest of the company. If the phrase "protective voting provisions" were not adopted for the purpose of encouraging acceptance of the offer, it probably had that effect.

The Prospectus would have been more accurate if it had told all stockholders what effect the exchange would have upon their voting rights and particularly had told holders of more than 50 shares that by accepting the Exchange Offer they would be surrendering shares with "full voting rights" for shares with "limited voting rights". The failure of the Prospectus to use some substantially similar characterization is indicative of the misleading way in which the solicitation material was presented.

■ In discussing the alleged advantages of the "protective voting provisions" the Prospectus is misleading in another re-

voting rights of Corporation and defendants, with their 1,804 shares of Corporation stock, would have more than 5 percent of its voting rights, achieved in large measure by the families dividing their holdings into approximately

50 shares each. See ¶ 30(b) of the Verified Complaint and defendants' concession in Doc. 24, p. 3, that the operative facts are not in serious dispute.

spect. It states that the "protective" provisions were designed to protect the small shareholders against domination by larger shareholders by limiting the voting power of larger shareholders. (p. 6). The assumption that control of a corporation by larger shareholders is generally detrimental to its interest whereas control by small stockholders is advantageous to it is unwarranted in the face of generally accepted principles of corporate democracy. What the Prospectus says in this regard further illustrates how one-sided its presentation of the Exchange Offer is.

The Prospectus specifically indicates at page 8 the alleged protection which scale voting seeks to achieve. It states:

"In the view of Corporation management, retaining the Protective Voting Provisions at the Corporation level will prevent a large shareholder (such as the Trustees of the bankrupt Penn Central Transportation Company), with a position which may be adverse to Railroad and in conflict with the interest of small shareholders, from gaining control of Railroad and forcing it to compromise disputes with such large shareholder."

■ The relationship between the plaintiffs and Railroad has been far from harmonious and at times was bitterly antagonistic. Furthermore, the Trustees and Railroad have substantial claims against each other. Because of this and other reasons their interests may at times be in conflict with the interest of the other stockholders. Defendants may well have a bona fide belief that control by the Trustees would not be in the best interest of the Railroad. Be that as it may, control by the Trustees would undoubtedly conflict with defendants' personal interest in maintaining themselves in office. It therefore behooved defendants to refrain from presenting in an *in terrorem* manner the problem which the Trustees' ownership involved. Obviously, the effect of that type of presentation was to tend to induce stockholders to accept the Exchange Offer.

There were fairer ways to state the possible significance of the Trustees' ownership

of Railroad stock. It was, of course, a factor which the Railroad stockholders were entitled to consider. Nevertheless, scale voting of Corporation's stock was to be permanent and continue beyond the time when the Trustees ceased owning their Railroad stock. The Trustees' ownership is probably temporary and future ownership depends upon the outcome of the Bankruptcy/Reorganization proceedings.

The Prospectus placed undue emphasis upon the Trustees' ownership of Railroad stock and should have pointed out the long range advantages and disadvantages of stock having scale voting as against stock having full voting rights. Other things being equal, stock with full voting rights usually has a greater value than stock with limited voting rights. By failing to discuss the significance of the Trustees' ownership of Railroad stock in an even-handed fashion the Prospectus omitted to state material facts necessary to prevent other statements which it made from being misleading.

The Prospectus and supplemental letter of December 24, 1976, considered in their totality, violate the disclosure requirements of section 14(e) of the Act. This is not to suggest that the material misstatements and omissions referred to were deliberate; they may have been inadvertent. Nonetheless, the violations of the Act clearly appear.

### Unclean Hands

Defendants assert that plaintiffs are barred from obtaining relief by the doctrine of unclean hands.

■ That doctrine is applicable only where the party seeking equitable relief is itself guilty of a violation involving the transaction in litigation. The alleged inequitable conduct must involve the subject of the litigation. It must have an immediate and necessary relationship to the equity which he seeks to obtain in the matter in litigation. *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933). See *Chris-Craft Industries, Inc. v. Independent Stockholders Committee*, 354 F.Supp. 895, 921 (D.Del.

1973) and *Root Refining Co. v. Universal Oil Products Co.*, 169 F.2d 514, 534 (3d Cir. 1948).

Defendants point to nothing that plaintiffs have done in connection with the Exchange Offer which under the principles of the foregoing cases subjects them to the defense of unclean hands.

### Relief

The preparation of the parties for the hearing on the motion for the preliminary injunction was thorough. Plaintiffs have borne the burden of proving, if the case should go to final hearing, they will prevail.

■ Unless a preliminary injunction issues, plaintiffs and the other stockholders of Railroad will be irreparably injured by defendants having violated the Act. Stockholders who elected to exchange their Railroad shares for those of Corporation will be damaged by surrendering shares with full voting rights for those with limited voting rights without having been first adequately advised of the consequences of their choice. Stockholders like plaintiffs who have elected not to exchange their shares will be damaged by being deprived of the potential right to effectively compete for control of Railroad. As of January 5, 1977, Corporation by virtue of the acceptance of the Exchange Offer, had already acquired over 53 percent of Railroad stock.

The remedy in damages is not adequate to compensate plaintiffs and other stockholders for their injury since the harm they have sustained is too difficult to estimate in terms of money. 2 Restatement-Contracts § 361(a) and Comment b.

The balancing of the equities favors the granting of injunctive relief in that the potential of irreparable harm to the Trustees and other Railroad shareholders, absent judicial intervention, outweighs the potential of irreparable harm to Railroad and Corporation from judicial intervention.

The advantages of doing equity immediately by the issuance of a preliminary injunction are far greater than they will be at a later time. See *Electronic Specialty Co. v. International Controls Corp., supra,* p. 947.

### Security

■ The probability of the ultimate success of plaintiffs upon final hearing has been demonstrated. It is unlikely that the deficiencies which appear in the total mix of disclosure can be cured at final hearing by oral or documentary evidence.[9] The chance of defendants being damaged because the preliminary injunction was wrongfully issued is minimal. For this reason only a nominal bond with corporate surety in a small amount will be required.

---

9. See colloquy in Doc. 57, pp. 19–20:

"THE COURT: Well, I should suppose, as I think about it, that the bond is simply to indemnify the railroad against loss which it sustains in the event that on final hearing I should come to a different conclusion.

MR. CARPENTER: Yes, your honor.

THE COURT: Am I going to get a different case on final hearing, when I come to it, than I get now?

MR. CARPENTER: Your Honor, I don't know. Speaking from our standpoint, we have submitted to the Court basically what our case is today. We have not intentionally withheld anything that we would present on the final hearing. We've tried to present as full a case and as complete a case as we could at this time."