Asher B. EDELMAN, Canran Associates I, L.P., Plaza Securities Company, and Arbitrage Securities Company, Plaintiffs,

v.

Sir Walter H. SALOMON, John Legge, the Earl of Dartmouth, Montagu Investment Management Limited, Canal-Randolph Corporation, Alfred D. Timm, A.B. Robbs, Jr., Dwight D. Sutherland, Rea Brothers Plc., Rea Brothers (Guernsey) Limited, Rea Brothers (Isle of Man) Limited, the Scottish and Mercantile Investment Company, Plc., Lancashire & London Investment Trust Plc., Ocean Wilsons (Holdings) Plc., Jastlin Limited, Fashion & General Investment Plc., Scottish Cities Investment Trust Plc. and Jocelin Harris, Defendants.

Civ. A. No. 83–9.

United States District Court,
D. Delaware.

March 16, 1983.

As Amended March 18, 1983.

---

**9.** It would appear from the pleadings in this case that jurisdiction in the Southern District of Florida would be properly based on diversity of citizenship, 28 U.S.C. § 1332. If however, jurisdiction could not have been initially established in a United States District Court, transfer under Title 28 would not be available.

Rodman Ward, Jr., Stephen P. Lamb, Stephen E. Jenkins, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., Stuart L. Shapiro, Michael W. Mitchell, Deborah Lin Smith, Jeremy A. Berman, Yvonne V. Miller, Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiffs.

A. Gilchrist Sparks, III, Kenneth J. Nachbar, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Wachtell, Lipton, Rosen & Katz, Proskauer, Rose, Goetz & Mendelsohn, New York City, for all defendants except Montagu, Robbs and Sutherland.

Michael D. Goldman, Donald J. Wolfe, Jr., John E. James, Potter, Anderson & Corroon, Wilmington, Del., Joseph T. McLaughlin, Charles B. Manuel, Jr., James P. Fallon, Shearman & Sterling, New York City, for defendant Montagu.

R. Franklin Balotti, Donald A. Bussard, Richards, Layton & Finger, Wilmington, Del., Walsh & Frisch, New York City, for defendants Robbs and Sutherland.

## OPINION

STAPLETON, District Judge:

This securities action arises out of a proxy contest for control of Canal-Randolph Corporation ("Canal-Randolph"). Plaintiffs seek preliminary and permanent injunctive relief which would, *inter alia*, postpone the annual meeting of Canal-Randolph stockholders currently scheduled for March 18, 1983, require that there be cumulative voting in the election of directors at that meeting, and direct that certain shares of Canal-Randolph in which defendants have an interest be "sterilized" at that meeting.

Plaintiff Canran Associates I, L.P. ("Canran") is a Delaware limited partnership and plaintiffs Plaza Securities Company ("Plaza") and Arbitrage Securities Company ("Arbitrage") are New York limited partnerships. Plaintiff Asher B. Edelman ("Edelman") is the controlling general partner of Canran, Plaza and Arbitrage. Edelman, indirectly through Plaza, Arbitrage and Canran, and directly, beneficially owns 322,200 shares, or 20.8 percent of the outstanding shares of Canal-Randolph stock. Plaintiff Eugene Eichenberg ("Eichenberg") is a resident of New York and is, and at all times relevant to this complaint has been, the owner of shares of the common stock of Canal-Randolph.

Defendant Walter H. Salomon ("Salomon"), a citizen and resident of England, is the Chairman of the Board of Canal-Randolph. Salomon is the record owner of 1,000 shares of Canal-Randolph stock. He also serves as Chairman of the Board of defendant Rea Brothers Plc. ("Rea Brothers"), and owns approximately 10% of its stock.

Defendants Rea Brothers, Rea Brothers (Guernsey) Limited ("RBG"), and Rea Brothers (Isle of Man) Limited ("RBI") (sometimes collectively referred to as "Rea Brothers") are corporations organized under the laws of England and Wales, the States of Guernsey and the Isle of Man, respectively, and are private banks involved in the investment management business. RBG and RBI are wholly-owned subsidiaries of Rea Brothers.

Defendants Alfred D. Timm ("Timm"), A.B. Robbs, Jr. ("Robbs") and Dwight D. Sutherland ("Sutherland") are directors of Canal-Randolph who beneficially own 200, 2,400 and 5,000 shares of Canal-Randolph stock, respectively.

Defendants Scottish and Mercantile Investment Company, Plc. ("Scottish"), Lancashire & London Investment Trust, Plc. ("Lancashire"), Ocean Wilsons (Holdings), Plc. ("Ocean"), Jastlin Limited ("Jastlin"), Fashion & General Investment, Plc. ("Fashion"), and Scottish Cities Investment Trust, Plc. ("Cities") (the "Scottish Group") are corporations organized under the laws of England and Wales. Scottish, Lancashire, Cities and Fashion are closed end investment companies, Jastlin is an investment company and Ocean is a trading company.

Defendant Canal-Randolph is a corporation engaged in the business of real estate

and stockyard ownership and management. Canal-Randolph had outstanding approximately 1,545,805 common shares as of January 19, 1983. Its common shares are registered with the Securities and Exchange Commission pursuant to Section 12(b) of the 1934 Act, 15 U.S.C. § 78l(b), and are traded on the New York and London Stock Exchanges.

Defendant Montagu Investment Management Limited ("Montagu"), a corporation organized under the laws of England, is an investment adviser.

Since 1956, when shares of the common stock of Canal-Randolph were first distributed to the public, Rea Brothers has acquired such stock on its own behalf, as market maker in Canal-Randolph common stock, on behalf of both discretionary and nondiscretionary account customers, and for investment companies managed by Rea Brothers, including Scottish, Fashion, Jastlin and Cities. A substantial amount of the Canal-Randolph common stock owned by discretionary account customers was registered in the name of a nominee company, Walsa (Nominees) Limited ("Walsa"). Walsa is an acronym for Walter Salomon.

Since 1956 and continuing to date, Rea Brothers has had the power to dispose of the common stock of Canal-Randolph held by discretionary account customers and investment companies it manages, aggregating in an amount in excess of five percent. As of January 1983, Rea Brothers had the power to dispose of approximately 438,000 shares of common stock of Canal-Randolph (approximately 28.6% of the outstanding shares). Rea Brothers has maintained the power to dispose of at least approximately 400,000 shares of Canal-Randolph common stock since approximately 1964.

Although the agreements between Rea Brothers and its discretionary account customers do not contain any provisions with respect to the manner in which securities held by Rea Brothers on behalf of such discretionary account customers are to be voted, Rea Brothers has had a general instruction from such customers to vote the Canal-Randolph common stock held by Rea Brothers on behalf of such customers in accordance with recommendations of the Board of Directors of Canal-Randolph, unless otherwise instructed.

Fifty (50) percent or more of the members of the Board of Directors of the managed investment companies owning Canal-Randolph stock are affiliated with Rea Brothers. The management agreement between Rea Brothers and the managed investment companies does not contain provisions with respect to the manner in which securities held by Rea Brothers on behalf of the applicable investment company are to be voted. In practice, however, the managed investment companies have authorized, and Rea Brothers has exercised, the power to vote the Canal-Randolph common stock owned by the managed investment companies in favor of management positions.

Montagu is an investment adviser to nine investment trusts and unit trust companies that own 7.7% of Canal-Randolph shares. Each trust is a separate legal entity under United Kingdom law and has a separate board of directors. While Montagu initiates investments for the trusts, the respective boards review those investments and have the right to rescind any purchase. Montagu owns no shares of Rea Brothers or its affiliates, and Rea Brothers owns no shares of Montagu. There are no cross-directorships between Montagu and any of the other defendants, including Canal-Randolph. Montagu owns no shares of Canal-Randolph.

Before 1981, Article TENTH of the Certificate of Incorporation of Canal-Randolph provided for the use of cumulative voting in the election of directors, but no stockholder had ever before used that provision to elect to the Board someone opposed by management. At the March 11, 1981 Annual Meeting, John Cushman, a stockholder owning 7.0 percent of the common stock of Canal-Randolph, voted his shares cumulatively in an unsuccessful effort to elect his nominee to the Board.

In reaction to Cushman's failed effort, Salomon decided to cause the Company to

call a special meeting of stockholders to eliminate the cumulative voting provisions in the Certificate. At Salomon's request, the Board of Directors of Canal-Randolph unanimously adopted resolutions setting forth a proposed amendment to the Certificate eliminating cumulative voting and instituting a classified or "staggered" board of directors.

On September 4, 1981, the Board distributed a Notice of Special Meeting of Stockholders to be held October 5, 1981 and management's Proxy Statement in connection with that meeting (the "1981 Proxy Statement"). By means of the proxy statement, the Board solicited stockholder approval of the charter amendment proposed by the Board. In a chart appearing prominently on page 2, the 1981 Proxy Statement stated that all directors and officers of Canal-Randolph, as a group, "beneficially owned" only 2.82 percent of Canal-Randolph's common stock and that Salomon was the beneficial owner of only 1,000 shares. The term "beneficially owned" was defined in a note to the chart which stated that "under regulations of the SEC, a person who has or shares the power to direct the voting or disposition of stock is considered a 'beneficial owner'." Thus, the 1981 Proxy Statement created the impression that management had the power to vote or dispose of 2.82 percent of the shares of the Company's stock.

The 1981 Proxy Statement failed to disclose that 425,000 Canal-Randolph shares were held by Rea Brothers' customers.[1] Moreover, it failed to report the facts concerning the voting of those shares and Rea Brothers' defeasible right of disposition with respect to those shares. Finally, the proxy statement failed to disclose that Salomon was the Chairman of Rea Brothers and its controlling stockholder.

After the 1981 Proxy Statement was disseminated but substantially before the meeting date, Salomon and Canal-Randolph's President Raymond French

("French") met with a director of Montagu to discuss Montagu's position on the proposed charter amendment. As presented to the stockholders, the single proposed amendment combined both the cumulative voting and classified board proposals. Montagu was opposed to the institution of a classified board and indicated its intention to cast its votes against the proposed amendment. As a result of that meeting, Salomon entered into an agreement with Montagu in order to obtain the necessary stockholder approval of the proposal to eliminate cumulative voting. Pursuant to the terms of that agreement Montagu agreed to vote all of its shares in favor of the charter amendment and Salomon agreed (1) to cause the Canal-Randolph Board to propose the elimination of the classified board at the next Annual Meeting, and (2) to vote the shares controlled or influenced by him in favor of such a proposal. This agreement is memorialized in a letter from Montagu to Salomon dated September 22, 1981.

Neither the fact nor the terms of Montagu's agreement to vote in favor of the proposals was disclosed to the stockholders of Canal-Randolph in any supplemental proxy material or in any other way before or at the Special Meeting. With Montagu voting its shares in favor, the amendment was reportedly adopted by the vote of 57.81 percent of the shares outstanding, with nearly 13 percent voting against.

In accordance with his agreement with Montagu, Salomon thereafter caused the Canal-Randolph Board to propose the elimination of the newly created staggered board at the 1983 Annual Meeting. The Company's proxy statement issued in connection with the 1982 Annual Meeting also did not disclose that agreement. The amendment was approved.

Since May 18, 1982, Edelman and the Partnerships have invested nearly $14 million in the stock of Canal-Randolph. In June of 1982, they filed a Schedule 13D. In

1. The Proxy Statement identified 295,133 shares as being owned by Rea Brothers' customers, but represented that no customer of

Rea Brothers, other than Scottish, owned as much as 5% of Canal-Randolph.

October of 1982, they announced an intent to take control of Canal-Randolph. Subsequent efforts to join with a third party in making a tender offer were unsuccessful and a decision to wage a proxy contest was made and disclosed in early December. At this point, none of the defendants had a Schedule 13D on file with the SEC.

In December 1982, Rea Brothers and the Investment Companies first retained American securities counsel. On December 17, 1982, Rea Brothers, Rea Guernsey and REA IOM filed a joint Schedule 13D with respect to the 438,500 Canal-Randolph shares owned by their respective customers (the "Rea Brothers' 13D"). On the same day Scottish and the other five Investment Companies filed a joint Schedule 13D with respect to the 237,750 Canal-Randolph shares owned by them (the "Investment Companies' 13D"). On December 29, 1982, Montagu filed a Schedule 13D with respect to the 119,100 Canal-Randolph shares owned by its customers.

On January 9, 1983, the Canal-Randolph Board met, scheduled the 1983 Annual Meeting to be held on March 9, 1983, and fixed the record date for that meeting as January 19, 1983. Section 6.1 of the Canal-Randolph by-laws required the Board to fix, in advance, a record date not exceeding fifty days preceding the date of the meeting. January 19 was the forty-ninth day prior to the March 9 meeting date.

On January 19, 1983 plaintiffs filed an action in the Delaware Court of Chancery seeking, *inter alia,* an order (1) declaring that the purported elimination of cumulative voting at the October 1981 Special Meeting was procured by fraud and a nullity, and (2) declaring that the stockholders of Canal-Randolph are entitled to use cumulative voting for directors at the 1983 Annual Meeting. On the same day, plaintiffs began this action alleging violations of Sections 10(b), 13(d), 18(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78m(d), 78r(a) and 78t(a). By agreement of the parties, the two actions were consolidated on March 4, 1983 by the filing of a Second Amended and Supplemental Complaint in this action and the dismissal without prejudice of the Delaware Chancery Court action. The new complaint also pleads a claim for relief under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a).

As a result of these actions, and an investigation by the Securities and Exchange Commission, the defendants found that they were unable to begin their proxy solicitation in time to hold the Annual Meeting on March 9. Under Section 6.1 of the by-laws, however, they could not move the date of the meeting back without setting a new record date. The Board's response, at a meeting held on February 22, 1983, was to amend the by-laws to allow them both to move the meeting date to March 18 and to keep the January 19 record date.

On February 25, 1983, Canal-Randolph issued management's proxy statement for the 1983 Annual Meeting (the "1983 Proxy Statement"). The proxy statement reported that management had:

(1) placed on the agenda at the March 18 meeting a proposal to reinstate cumulative voting;

(2) unanimously recommended that the proposal be defeated; and

(3) declared that unless a majority of the shares outstanding are voted in favor of the proposal, directors will be elected by a simple majority.

Four days after the issuance of management's 1983 Proxy Statement, plaintiff Edelman issued his own proxy materials soliciting votes in favor of the cumulative voting proposal and Edelman's slate of directors. He sought authority to vote the shares cumulatively to elect minority representatives to the Board if cumulative voting is permitted at the meeting.

On March 1, 1983 the SEC filed two cases in this Court; one against the plaintiff Partnerships alleging violations of Section 13(d) of the Exchange Act in connection with Schedules 13D on file during the summer and fall of 1982, and the other against Canal-Randolph, Rea Brothers and Scottish alleging violations of Sections 13(d) and

14(a) of that Act. Simultaneously, the SEC submitted settlement agreements and consent orders in each case. The consent orders were entered by the Court on March 1, 1983.

Plaintiffs allege in this action that the defendants have violated the Securities laws by (1) failing to file Schedules 13D before December 1982, (2) by filing misleading Schedules 13D at that time, (3) by soliciting proxies for the 1981 Special Meeting on the basis of a misleading 1981 Proxy Statement, and (4) by soliciting proxies for the upcoming Annual Meeting on the basis of a misleading 1983 Proxy Statement. Plaintiffs also contend that the directors of Canal-Randolph breached their fiduciary duty under Delaware law by amending the Annual Meeting by-law, by casting the 1983 cumulative voting proposal as they did, and by failing to disclose material facts in connection with the 1981 Special Meeting and the 1983 Annual Meeting.

Certain of the defendants acknowledge that they had a duty to file a Schedule 13D before December of 1982, but deny that these were knowing violations of the law. Moreover, they insist that plaintiffs were not in any way misled by these failures to file and that they have, accordingly, suffered no injury from them. The defendants deny that plaintiffs are entitled to any relief on the Section 14 claims and assert that there have been no breaches of fiduciary duty. Finally they maintain that plaintiffs have "unclean hands" because of a number of allegedly misleading statements in Edelman's Schedule 13D filings and his 1983 proxy materials.

## I. THE CUMULATIVE VOTING CLAIMS

The 1981 Proxy Statement told Canal-Randolph shareholders that management controlled no more than 2.8% of the outstanding stock, when, as a practical matter, it controlled, through Salomon and Rea Brothers, a block of stock many times that size. Moreover, no supplementary materials were dispatched in 1981 reporting on the Montagu agreement reached more than sixteen days before the meeting.[2] The information thus withheld, which was concededly known by Canal-Randolph's Chairman of the Board, was, of course, highly material to the proposal which management had placed before the stockholders. The existence or non-existence of a large control block is something a stockholder would want to know about when deciding whether cumulative voting should be retained. The Montagu agreement was important, *inter alia*, not only because it had the effect of altering the character of the proposed package but also because Montagu's reliance on Salomon's promise to rescind the classified board provision forcefully demonstrated Salomon's control of Canal-Randolph.

In summary, the undisputed facts reveal two clear violations of Section 14(a) by Canal-Randolph's management in connection with its solicitation of proxies for the 1981 Special Meeting. It is equally clear, I believe, that management's failure to disclose the control facts and the Montagu agreement were violations of its fiduciary duty to stockholders under Delaware law. *Lynch v. Vickers Energy Corp.*, 383 A.2d 278 (Del.1977).

The final relief,[3] which this Court and the Delaware Courts have traditionally given in situations of this kind, has been a decree nullifying the corporate action taken on the basis of management's proxies. *See, e.g. Dillon v. Berg,* 326 F.Supp. 1214 (D.Del.), *aff'd,* 453 F.2d 876 (3d Cir.1971); *Bertoglio v. Texas Int'l Co.,* 488 F.Supp. 630, 663 (D.Del.1980); *Dillon v. Scotten, Dillon Co.,* 335 F.Supp. 566, 572 (D.Del.) *aff'd,* 453 F.2d 876 (3d Cir.1971); *Schnell v.*

---

**2.** Defendants do not dispute that there was a duty to disclose the Montagu agreement even though the original proxy statement had been issued several days before the agreement was reached. *See* Rule 14a–9, 17 C.F.R. § 240.14a–9.

**3.** The parties agree that the plaintiffs' claims relating to the 1981 meeting are before me for final resolution on the current paper record, even though the remaining issues are presently presented only in the context of plaintiffs' motion for a preliminary injunction.

*Chris-Craft Industries, Inc.,* 285 A.2d 437 (Del.1971). Defendants[4] acknowledge this general rule but contend that no such relief should be granted in this case. They made four arguments in support of this position. The first is that neither plaintiff is entitled to void the 1981 charter amendment because Edelman was not a stockholder in 1981, and because Eichenberg did not give a proxy during the 1981 solicitation. Second, defendants assert that they have proven that there is no causal connection between the withholding of material information and the adoption of the 1981 charter amendment. Third, it is urged that the Court should take no action until after the stockholders have expressed their views about cumulative voting at the 1983 meeting. Finally, defendants argue that the plaintiffs are barred from seeking relief from a court of equity because Edelman's conduct during his 1983 proxy solicitation has given him "unclean hands." I find none of these contentions persuasive.

Edelman was not a stockholder in 1981 and bought his shares with full knowledge of the elimination of cumulative voting. Plaintiffs acknowledge that he is not entitled to a declaration that the 1981 charter amendment is void. They point out, however, that Eichenberg was a stockholder at all relevant times. Defendants counter with Canal-Randolph records which demonstrate that Eichenberg gave no proxy in 1981 and argue that his lack of interest in 1981 bars equitable relief now. These records are legally irrelevant, however.

The issue which defendants present was addressed by the Sixth Circuit Court of Appeals in *Dann v. Studebaker-Packard Corporation,* 288 F.2d 201 (6th Cir.1961). While the Court there addressed the issue as one of standing rather than as one concerning the availability of equitable relief, the conclusion reached is equally appropriate here:

> But does a stockholder who has not himself given a proxy pursuant to false and misleading solicitation have standing to assert such right of action? This question is squarely presented here. These appellants do not specifically allege that they themselves were misled by the appellees or that they gave appellees any proxies at all. As we have noted above, the right sought to be protected by federal law is the right to full and fair disclosure in corporate elections. Therefore, it is not important whether or not the complaining stockholders were deceived— they could suffer equally damaging injury to their corporate interests merely because other shareholders were deceived in violation of federal law. Accordingly, they should be entitled to protect themselves against such violations to the same extent as if they, themselves, were the direct victims of the unlawful deception. . . .[5]

In this case, Eichenberg was deprived of his right to vote his stock for directors on a cumulative basis by means of a misleading proxy solicitation. The character of the defendants' conduct and its impact upon Eichenberg are no different, and there should be no difference in the availability of equitable relief, depending upon whether or not he was misled into giving management a proxy. Assuming that his failure to grant a proxy indicates a lack of concern on his part about the 1981 proposal, that lack of concern was in the context of a belief that management controlled "the amount shown in the proxy material, approximately 2.8% of the total." Eichenberg Dep. pp. 8–9. A lack of concern in that context does not indicate that Eichenberg would have failed to vote had he been aware of all the material facts.

---

**4.** The term "defendants" is used throughout this opinion to refer to those defendants who are defending against the particular claim being discussed. Not every claim implicates all defendants. Montagu is a defendant only with respect to plaintiffs' Section 13(d) claims, for example, and takes no position with respect to the remaining claims.

**5.** *Id.* at 209. *See also Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 599 n. 28 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974); *Leff v. CIP Corp.,* 540 F.Supp. 857, 865 (S.D.Ohio 1982). *But see Gaines v. Haughton,* 645 F.2d 761 (9th Cir. 1981).

I further conclude that the Supreme Court of Delaware would reach the *Dann* Court's result in the context of a case based upon a *Lynch v. Vickers* theory. *Accord Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del. 1983).

Nor can I agree with defendants that the record demonstrates a lack of causal nexus between the information withheld by management and the passage of the charter amendment. There is simply no basis for non-speculative prediction as to what would have happened in the absence of these violations of duty. Moreover, this Court has squarely rejected defendants' argument as being unsound as a matter of law. In *Gould v. American Hawaiian Steamship Company,* 319 F.Supp. 795 (D.Del.1970), *rev'd on other grounds,* 535 F.2d 761 (3d Cir.1970), the defendants submitted affidavits of stockholders who explained that their vote in favor of certain corporate action was based on their own independent investigation and would have been cast in the same manner even if management's proxy materials had not been misleading. The shares of these stockholders and those of management would have been sufficient to approve the corporate action. Quoting from *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), Judge Wright observed that a stockholder in a Section 14(a) case makes "[a] sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation . . . was an essential link in the accomplishment of the transaction." 319 F.Supp. at 810. Judge Wright expressly held "that the necessary causation will be established as a matter of law if the Court determines the alleged misstatements and omissions in the proxy to be material." Nothing which has occurred since the *Gould* decision suggests to me that this holding is no longer sound law.

■ I agree with the premise of defendants' third argument that it is proper to consider the upcoming shareholders' meeting in the course of determining what final equitable relief should be given. I do not, however, share their view that passage of the 1983 cumulative voting proposal would obviate the need for any relief on the 1981 proxy solicitations claims. I disagree for two reasons, each of which provides a sufficient answer to defendants' contention.

The 1983 Proxy Statement tells Canal-Randolph stockholders that it will require an affirmative vote of a majority of the corporation's outstanding stock to reinstate cumulative voting. Given the other information contained in that proxy statement regarding management's position on the proposal and the knowledge that substantially less than 100% of the shares can be expected to vote,[6] this statement regarding the required vote makes a proxy favoring cumulative voting appear to be a futile gesture. For this reason, a vote on the cumulative voting proposal at the 1983 meeting will not provide a true reflection of the desires of Canal-Randolph's minority shareholders.

Moreover, this representation regarding the required vote is not the only deficiency in the 1983 Proxy Statement which is material to the cumulative voting proposal. In that proxy statement, management solicits proxies against the reinstatement of cumulative voting without revealing that the elimination of cumulative voting in 1981 was achieved through a proxy solicitation in which management withheld critical information.

The 1983 Proxy Statement discloses the control facts withheld in 1981, as well as the existence and terms of the Montagu agreement. It does not, however, report the fact that this information was not provided to shareholders in 1981. The effect of having no cumulative voting of Canal-Randolph shares is to insure that management will not have to contend with hostile voices on the board. This may or may not be a good idea, but surely shareholders making a deci-

---

**6.** For example, only 70% of the outstanding Canal-Randolph stock was voted at the 1981

Special Stockholders' Meeting.

sion on the cumulative voting issue should know that current management misled them in 1981 in an effort to achieve that result.

Defendants stress that the 1983 Proxy Statement does report Edelman's claim in the Chancery action that management had failed "to disclose facts concerning the beneficial ownership of the corporation's common stock in connection with adoption of the 1981 amendment and that the proxy statement issued in connection therewith contained material misrepresentations." (Supplemental Affidavit of Michael W. Schwartz, Exh. 67 at p. 13). The 1983 Proxy Statement also reports, however, that the corporation believes there are "meritorious defenses" to these claims. Similarly, the description of the SEC's claim that the corporation had solicited proxies by means of deficient proxy statements was accompanied by a statement that the corporation did not admit these allegations. The net effect was to give the impression that management denies any deficiency in its 1981 proxy solicitation.

I do not suggest that management needs to engage in self-flagellation or must accept its adversary's characterization of its conduct. Clearly that is not what the law requires. *Ash v. LFE Corp.,* 525 F.2d 215, 220 (3d Cir.1975); *Seaboard World Airlines, Inc. v. Tiger International, Inc.,* 600 F.2d 355, 363 (2d Cir.1979); *Missouri-Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 873 (2d Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974); *Bertoglio v. Texas International Co.,* 488 F.Supp. 630, 649 (D.Del.1980). Thus, Canal-Randolph did not need to confess to "fraud" to meet the requirements of the law. But the content of the 1981 Proxy Statement is a mat-

ter of fact and, given the agenda at the 1983 meeting, management had a duty to disclose that the 1983 Proxy Statement did not contain the control facts or the facts concerning the Montagu agreement.

■ Finally, I turn to defendants' "unclean hands" argument. I assume without deciding that Eichenberg is chargeable with Edelman's unclean hands, if any unclean hands there be.[7] But Edelman is not charged with any inequitable conduct in connection with the subject matter of the claim based upon management's 1981 solicitation. As earlier noted, he had no association with Canal-Randolph at that time. "Unclean hands" bars equitable relief only when the inequitable conduct involves the subject matter of the plaintiffs' claim. *Blanchette v. Providence & Worchester Co.,* 428 F.Supp. 347, 357 (D.Del.1977).

It follows that plaintiff Eichenberg is entitled to a decree that the 1981 charter amendment is void and that cumulative voting shall be utilized in future elections of Canal-Randolph directors unless and until there is a duly adopted charter amendment eliminating it. It also follows that a vote on the 1983 cumulative voting proposal based on the current proxy materials would be pointless.[8] Since plaintiffs seek additional relief based on other claims, I now turn to those claims.

## II. THE ELECTION OF DIRECTORS CLAIM.

■ Plaintiffs seek a preliminary injunction postponing the 1983 election of directors and requiring a resolicitation by management before any such election is held. While it is not customary to grant such relief at the preliminary injunction

---

**7.** *Compare Gaudiosi v. Mellon,* 269 F.2d 873, 882 (3d Cir.1959). In this case, unlike *Gaudiosi,* the interest which the "innocent" plaintiff seeks to protect (i.e. the right to continue to cast cumulative votes in elections of directors) extends beyond any interest which he may have in the election of Edelman's slate to the Board and the relief sought goes beyond enjoining management's use of proxies in the upcoming election. I question whether joining forces in a proxy fight with someone who thereafter

violates the proxy rules should bar vindication of an otherwise "innocent" shareholder's ongoing right to cumulative voting.

**8.** Any inequitable conduct of Edelman during the 1983 proxy contest would be relevant to his right to obtain injunctive relief against a vote on management's cumulative voting proposal. As explained hereafter, however, I find no relevant misconduct on his part.

stage, this is an exceptional case and I conclude that a preliminary injunction should be issued.

· Plaintiffs have made a strong showing of a probability of ultimate success on their claim that management's 1983 proxy solicitation violated Section 14(a) and of their entitlement to the requested relief in connection with the 1983 election of directors. This is apparent from the foregoing discussion of the cumulative voting claim and the further finding that the fact omitted is material not only to the 1983 cumulative voting proposal but also to the 1983 election of directors. The 1981 cumulative voting-classified board proposal was one in which management had a self interest and the fact that it pursued that self interest through a proxy solicitation in which it represented that it controlled only 2.8% of the stock is something that a stockholder asked to reelect that management should know.

This is an unusual case in part because this showing of a probability of success is based almost entirely on undisputed evidence and there is, accordingly, little chance that the Court's conclusions after a trial on the merits will differ from those now reached. The Section 14(a) violation is apparent from the undisputed facts concerning the 1981 proxy solicitation and from the face of the 1983 Proxy Statement. The only area in which there appears to be any room for a further development of the record is in connection with defendants' unclean hands defense, to which I now turn. Even in this area, however, the documents themselves tell most of the story.

Edelman is accused of inequitable conduct in the course of the 1983 proxy solicitation contest from which his Section 14(a) claim arises. Since I will continue to assume that the condition of Eichenberg's hands must be deemed to be the same as that of Edelman's, I must make a preliminary evaluation of those charges.

The first category of charges against Edelman relates primarily to a section in his proxy materials entitled "Known Conflicts of Interest of Sir Walter Salomon." This section points out that Salomon is Chairman of the Board of both Canal-Randolph and Rea Brothers and then goes on to accurately describe four instances in which Canal-Randolph and Rea Brothers or one of its affiliates have done business together. Defendants purport to view this portion of Edelman's solicitation materials as misleading because he admits that he has no knowledge suggesting that these business dealings were not economically fair to Canal-Randolph. In the absence of such knowledge, according to defendants, the assertion that a conflict of interest exists is "without factual foundation" and violates Rule 14a–9. In context, however, I regard the "conflicts of interest" heading as fair argument based on accurately reported facts. I also place in the fair argument category the assertion in Edelman's proxy statement that he "believes" certain year end sales of real estate were made to "prop-up" earnings.[9]

The second category of charges against Edelman relates to his March 4th press release which describes the amended and supplemental complaint filed in this suit. In reliance on the "press release" exemption of Rule 14a–6(g), this release was not filed with the SEC in advance of dissemination. Defendants assert that this document is not a bona fide attempt to keep the market advised of current developments and that it misleadingly refers to the Montagu agreement as "voting buying." The document does report on a current development, however, and I am not prepared to say that the failure to preclear it was a proxy rule violation. Moreover, with respect to Edelman's

---

**9.** The challenged portion of the proxy statement reads as follows:

In its 1982 Annual Report to Shareholders, Canal-Randolph reported the "highest" net earnings in its history—$5.54 per Share. However, $4.45 (or over 80%) of these earnings were not attributable to ongoing opera-

tions; rather, they occurred from the year-end sale of two properties. Asher Edelman believes these sales were only made to prop-up reported year-end earnings. Had these sales not occurred, Canal-Randolph's earnings per Share for 1982 would have been only $1.09, down $.21 (or over 16%) from 1981.

characterization of the Montagu agreement, once again I find it to be within the scope of fair argument.

Finally, defendants allege that Amendment No. 9 to Edelman's Schedule 13D is misleading and, accordingly, violates Section 13(d) of the Exchange Act. The challenged segment of the Amendment describes recent settlement discussions between the parties. Its preface states that the purpose of the extension of the meeting from March 9th to March 18th was to permit Edelman and the Company to pursue such discussions. I am not persuaded that Edelman does not believe this to have been a purpose of the postponement, but in any event, I do not regard the challenged statement as material in light of the fact that the described settlement discussions concededly did take place.

In *Mills v. Electric Auto-Lite,* 396 U.S. 375, 383, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970), the Supreme Court recognized that use of a solicitation which is materially misleading poses the kind of irreparable injury to stockholders which can justify injunctive relief prior to a shareholders' meeting. Where the violations of Section 14(a) are as clear as they are in this case, I believe that it is in the best interest of the stockholders and the public to allow a time for clearing the air and disseminating the information necessary to eradicate false impressions. While I do not rest my decision upon it, I also believe it is preferable for the stockholders to make a decision on how to cast their votes in the election of directors at a time when the confusion regarding cumulative voting has been cleared up.[10]

### III. THE FAILURE TO FILE CLAIMS.

While there is no dispute about the fact that Rea Brothers and Scottish violated Section 13(d) by failing to file a Schedule 13D prior to December of 1982, plaintiffs' case in support of its application for a preliminary injunction "sterilizing" the Canal-Randolph shares registered in the name of Walsa is insubstantial. Such a separation

of voting power from beneficial ownership is a very extraordinary form of relief. It is clearly inappropriate in a case (1) where plaintiffs have presented no persuasive evidence that the violations were knowing ones or that the defendants have benefited from them and (2) where the stock to be sterilized is owned by persons who are not parties to this action and who have violated no legal duty. While these clients of Rea Brothers may have allowed their shares to be voted for them in the regular course of business, this is no justification for disenfranchising them during a proxy contest and I decline to do so.

### IV. CONCLUSION.

A final judgment will be entered declaring the 1981 Amendment to Canal-Randolph's Certificate of Incorporation to be void and directing that cumulative voting be permitted in future elections of Canal-Randolph directors unless and until an amendment is duly adopted which eliminates such voting. A preliminary injunction will be entered postponing the March 18th annual meeting of stockholders and requiring that curative proxy materials be circulated before the election of directors goes forward.

---

10. Given the conclusion which I reach on this claim, I need not address plaintiffs' claim that the Canal-Randolph Board's amendment of the

Annual Meeting by-law constituted a breach of fiduciary duty. *See Schnell v. Chris-Craft Industries, Inc.,* 285 A.2d 437 (Del.1971).