# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ROBERT A. DAVIDOW,                )
                                  )
                  Plaintiff,      )
        v.                        )
                                  )   C.A. No. 2019-0150-MTZ
LRN CORPORATION, DOV              )
SEIDMAN, LEE FELDMAN AND          )
MATS LEDERHAUSEN,                 )
                                  )
                  Defendants.     )

## MEMORANDUM OPINION

Date Submitted: November 5, 2019
Date Decided: February 25, 2020

Stephen D. Dargitz, Kevin H. Davenport, and Jason W. Rigby, PRICKETT, JONES, & ELLIOTT, P.A., Wilmington, Delaware, *Attorneys for Plaintiff Robert A. Davidow.*

Kevin G. Abrams, J. Peter Shindel, and April M. Kirby, ABRAMS & BAYLISS LLP, Wilmington, Delaware; James E. Brandt and Blair Connelly, LATHAM & WATKINS, LLP, New York, New York, *Attorneys for Defendants LRN Corporation, Dov Seidman, Lee Feldman, and Mats Lederhausen.*

**ZURN, Vice Chancellor.**

A corporation that advises firms on ethics and compliance launched a self-tender offer. The plaintiff, who tendered all his shares in that offer, now alleges that the defendant corporation, its founder and chairman, and two additional directors breached their fiduciary duties by launching a coercive self-tender at an unfair price of $1.35 per share, providing inadequate disclosures, and authorizing the self-tender notwithstanding the directors' interestedness. The self-tender was allegedly part of a scheme to increase the founder's control over the company by excising outstanding stockholders at an unfair price before completing an undisclosed sales process that was underway at the time of the self-tender. Through that sales process, the individual defendants received a windfall when they cashed out at $7.00 per share, and the founder secured other benefits for himself. The defendants moved to dismiss for failure to state a claim. I deny the motion to dismiss with respect to the individual defendants, but grant the motion to dismiss with respect to the defendant corporation.

## I. BACKGROUND

On February 25, 2019, Plaintiff Robert A. Davidow filed a Verified Complaint (the "Complaint") pursuant to Court of Chancery Rule 23, individually and on behalf of all stockholders who tendered in the subject self-tender (the "Class").[1] Defendants in this action are LRN Corporation ("LRN" or the "Company"), and its

---

[1] Docket Item ("D.I.") 1 [hereinafter "Compl."]. Defendants have not challenged Plaintiff's class allegations.

directors Dov Seidman, Lee Feldman, and Mats Lederhausen (collectively, the "Individual Defendants," and together with LRN, "Defendants"). On April 23, 2019, Defendants moved to dismiss for failure to state a claim (the "Motion").[2] I heard argument on November 5.[3]

I draw the following facts from Plaintiff's Complaint and certain documents integral to it.[4] LRN is a Delaware corporation that provides advisory services in ethics and compliance. As of October 6, 2017, LRN had 39,705,818 shares of common stock issued and outstanding and had 6,020,000 shares of stock issuable upon the exercise of stock options. Seidman founded LRN and has been its chief executive officer and chairman of its board of directors since 1993. Lederhausen has been a director since 2012, and Feldman has been a director since 2000. Feldman is a former partner of an LRN stockholder, Softbank Capital Partners, which held LRN shares until 2011. The Individual Defendants have not disclosed the number of LRN shares they hold personally.

---

[2] D.I. 12.

[3] D.I. 27.

[4] *See generally* Compl. On this Motion, I consider the Offer to Purchase, Introductory Letter, Cover Letter, Letter of Transmittal, and Merger Notice, attached as exhibits to Defendants' opening brief, because they are integral to the Complaint. *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014). Accordingly, considering those documents does not convert Defendants' Motion to a motion for summary judgment.

Historically, the Company has given its stockholders only minimal and selective disclosures. LRN has not held an annual stockholders' meeting for many years. LRN has not provided proxy statements, timely notices of major transactions, or quarterly financial reports. Accordingly, stockholders have not elected directors or received disclosures that are typically provided by a proxy statement, including information about director and officer compensation and the number of shares held by directors and officers. LRN has provided stockholders with annual financial statements, but not until nearly one year after the fiscal year-end, and those statements were meager.[5] LRN's common stock has never been publicly traded or registered with the SEC.

Plaintiff also alleges a history of granting stock options and buying stock at arbitrary prices and with inadequate disclosures to benefit LRN's board members and their affiliates. These transactions enabled LRN to "pick[] off hundreds of thousands of additional shares from its shareholders at an unfair price"[6] and significantly increase Seidman's voting power. Defendants never disclosed Seidman's holdings.

---

[5] For example, LRN sent stockholders 2012's financial statements on October 4, 2013, 2013's financial statements on November 4, 2015, and 2014's financial statements on December 7, 2016. The notes to these statements provided little information beyond basic performance, and failed to disclose the number of shares owned by LRN's directors and officers or their compensation. The statements also did not disclose complete information on conflicted transactions.

[6] Compl. ¶ 22.

For example, LRN disclosed in 2010's financial statements that its board repriced 2,733,507 stock options granted to "various employees across the Company" from $3.43 to $2.67 in February 2010.[7] Less than one year later, in January 2011, LRN agreed to repurchase common and converted preferred stock at different prices from two LRN stockholders, one of which was affiliated with Feldman.[8] In that transaction, LRN purchased over 12.5 million shares of common stock at an average of $3.38 per share, and specifically bought from Feldman's affiliate at an average of $3.14 per share.[9] Shortly thereafter, in November 2011,

---

[7] *Id.* ¶ 15. LRN did not disclose how the board arrived at $2.67, or whether any valuation was performed in setting that price. LRN also did not disclose which LRN employees were granted the options, or whether Seidman held such options. LRN only informed stockholders that this "modification" increased LRN's compensation expense for 2010 by $414,275.00.

[8] LRN entered into a Share Purchase Agreement with SOFTBANK Capital Advisor Fund L.P., SOFTBANK Capital L.P., and SOFTBANK Capital Partners L.P. (collectively, "Softbank") and Polaris Venture Partners IV L.P., and Polaris Venture Partners Entrepreneurs' Fund IV L.P to repurchase shares at prices above $2.67 per share. At that time, Feldman was a partner of Softbank.

[9] Under the Share Purchase Agreement, LRN repurchased Softbank's 1,500,000 shares of common stock at $2.33 per share and then converted Softbank's 1,479,762 shares of Series A Convertible Preferred Stock into 4,439,286 shares of common stock, repurchasing that converted stock for $3.42 per share. In addition, LRN converted 2,022,654 shares of Polaris's Series A-1 Convertible Preferred Stock into 6,590,205 shares of common stock, then repurchased that converted stock for $3.59 per share. LRN amended the Share Purchase Agreement five times between June 2011 and September 2011. LRN did not promptly disclose the Share Purchase Agreement; how the parties negotiated the Share Purchase Agreement; the reason the parties entered the Share Purchase Agreement; the reason the repurchased share prices differed; how the Company determined the repurchase prices; or whether the Company obtained a fairness opinion on the repurchases. LRN also failed to provide adequate disclosures regarding Feldman's involvement in the transaction and the five amendments.

LRN initiated a self-tender offer for up to 4 million shares of common stock for $2.00 per share. Defendants only disclosed that LRN's "most recent third party appraisal . . . , which was conducted for tax and accounting purposes used in the issuance of the Company's options, valued our Common Stock at $2.59 per share as of October 31, 2009[;]"[10] and that "$2.00 per share reflects the amount that we believe is reasonable and appropriate."[11] In the accompanying letter of transmittal, Defendants included boilerplate release language.

Then, in December 2013, LRN repurchased 808,834 shares for $0.62 per share.[12] LRN's performance could not have precipitated the meager purchase price. To the contrary, LRN performed well enough to donate to Seidman's charitable organization and pay off approximately $12 million of the Company's $30 million long-term debt in 2013. And in 2014, LRN was able to pay off its long-term debt with a single $13.57 million payment.

---

[10] *Id.* ¶ 19. LRN did not disclose who performed the appraisal, how it was conducted, or what information and methodologies the appraiser relied on.

[11] *Id.* ¶18. But LRN failed to disclose why the Board determined the $2.00 price—which reflected a 22.8% discount from $2.59—was "reasonable and appropriate" in light of the 2009 appraisal, especially considering that just months after the 2009 appraisal LRN repriced options at $2.67 per share and that shortly before the 2011 Self-Tender LRN repurchased shares from Feldman's company at approximately $3.14 per share.

[12] The purchase totaled roughly $500,000. LRN disclosed no other information about the 2013 stock repurchase.

In this murky context, the multi-step scheme alleged in this case began with an undisclosed grant of "spring-loaded" stock options to the Individual Defendants and other insiders (the "2017 Options"). According to LRN's 2015 financial statements, LRN had approximately 3.8 million stock options outstanding and no options left to grant under the Company's Amended and Restated 2000 Stock Option Plan. But between the end of 2015 and October 2017, LRN issued 2.2 million options, a 58% increase to the 2015 amount, without ever disclosing any information about the grants. These 2017 Options represented nearly 5% of LRN's fully diluted equity.

To price the 2017 Options, LRN obtained an appraisal on May 31, 2017, which valued LRN stock at $1.35 per share (the "Appraisal"). Plaintiff alleges that Defendants issued the 2017 Options on the May Appraisal date. Defendants never disclosed whether all of LRN's outstanding options had been repriced at the Appraisal price of $1.35 per share.

Defendants intentionally timed the Appraisal and the 2017 Options. When the Appraisal was conducted, LRN expected to receive over $20 million in cash payments for "non-recurring events outside the ordinary course of business."[13] Indeed, LRN received that sum in August and September 2017. Defendants intentionally excluded the $20 million from the Appraisal to reduce the option price,

---

[13] *Id.* ¶¶ 27, 32.

spring-loading the 2017 Options. In this way, the Individual Defendants set the stage for the self-tender offer and subsequent sale at issue by obtaining the Appraisal (which omitted an extraordinary cash infusion) and issuing themselves the 2017 Options (based on that Appraisal) in secret.

The next step was to increase Seidman's control through the self-tender offer (the "2017 Self-Tender"), which was paid for with the Company's $20 million cash infusion and justified by the Appraisal. The Individual Defendants allegedly initiated the 2017 Self-Tender to reduce the number of shares outstanding and increase the amount of consideration they would receive in the subsequent and anticipated sale of the Company.

On October 6, 2017, Defendants launched the 2017 Self-Tender to acquire up to 7,407,407 shares of common stock, or up to $10 million worth of shares, for $1.35 per share. Defendants sent an Offer to Purchase ("OTP") to LRN stockholders. The OTP repeatedly stated that the purpose of the 2017 Self-Tender was to provide stockholders with liquidity. The OTP disclosed that "[i]n August and September 2017, we received certain one-time lump sum payments of over $20.0 million in the aggregate as the result of certain non-recurring events outside the ordinary course of business."[14] Defendants disclosed their determination that LRN had "no strategic or operational need to retain this cash within LRN," and that "in recognition of your

---

[14] D.I. 12, Ex. 1 at 2.

support and also that a number of you have expressed an interest in obtaining liquidity, the LRN board decided to allocate a portion of these funds to provide you an opportunity to sell your shares."[15] Defendants did not disclose any information about how or why LRN received this $20 million, who paid it and why, what LRN sold or did in exchange for it, or how or why it was outside the ordinary course of business. The $20 million was allegedly material to LRN, which had $46.9 million in total assets and $43.4 million in revenue in 2015.

Plaintiff alleges that when Defendants commenced the 2017 Self-Tender, they had already began discussing a strategic process to sell the Company at a price higher than $1.35 per share, and had either received or expected to receive offers from potential buyers at higher prices. Defendants did not disclose this information to stockholders. But the OTP warned stockholders that if they did not tender, it was "possible you would have to hold your Common Stock for a long period of time without receiving any cash or other payment for them. It is possible that you may never receive cash or other payment for your Common Stock if you do not take the Offer."[16] It further stated, "[F]rom time to time we may evaluate or consider pursuing strategic alternatives, including but not limited to a sale of the Company."[17]

---

[15] *See id.* Ex. 3 at 1, Ex. 4 at 1.

[16] Compl. ¶ 24.

[17] *Id.*

Defendants disclosed that $1.35 per share "is not a determination of the fair market value of your shares," but "reflects the amount that we believe is reasonable and appropriate for each of the Aggregate Shares in light of the purposes of the Offer."[18] The OTP stated that the "current fair market value of your shares or the value of those shares in the future could be worth substantially more, particularly to a potential strategic buyer or investor, or substantially less than $1.35 per share."[19]

The OTP disclosed that the $1.35 per share price was based on the May 2017 Appraisal, and further disclosed that the Company relied on the Appraisal "in the issuance of the Company's options."[20] This was the first time stockholders learned of the Appraisal and that additional options, i.e. the 2017 Options, had been granted. The OTP explained that the $20 million lump sum payment was intentionally excluded from the Appraisal. That was the only information disclosed about the Appraisal. Defendants did not disclose who performed the Appraisal, what standard of value was used, what valuation methodologies or inputs were used, what information was relied on, or whether management provided any financial projections to the supposed appraiser.

---

[18] *Id.* ¶ 28.

[19] *Id.* ¶ 26.

[20] *Id.* ¶ 29.

As to the OTP's statement that the Appraisal was used in issuance of stock options, the stockholders had previously understood that LRN had not granted options since 2009. The 2015 financial statements, which were the most recent financial statements provided to stockholders before the 2017 Self-Tender, stated that there were 3,811,707 shares of stock issuable upon the exercise of options. The OTP states that there were 6,020,000 shares of stock issuable upon the exercise of options. The OTP does not explain this difference. And the OTP does not disclose whether the Appraisal was used for the additional purpose of repricing existing stock options or for some other option-related reason.

Other than the Appraisal, the OTP provided scant information to use in assessing the offer price. The OTP did not provide current or recent information about LRN's performance. Plaintiff alleges that the 2017 Self-Tender was purposefully timed to avoid providing stockholders with current and accurate statements from 2016: Defendants did not include audited financial statements for 2016 purportedly because those statements were not finished by the October 6, 2017 OTP.

The OTP only provided audited financial statements from 2014 and 2015 for stockholders to use in deciding whether to tender their shares in October 2017. The OTP also provided a draft, two-paged unaudited balance sheet and statement of operations for LRN as of the year ended December 31, 2016 and eight months ended

August 31, 2017. But the OTP instructed stockholders not to rely on those draft statements "as being representative of our results of operation or financial condition for those periods or as an indicator of our future results of operations or financial condition."[21] The OTP did not contextualize or fully explain the brief financial information provided, and selectively disclosed financial events.[22] The OTP instructed stockholders to rely "only on the information contained in the [OTP] and in the Letter of Transmittal."[23]

The OTP disclosed that, if successful, it would cause Seidman to own more than 50% of LRN's stock:

> Assuming we consummate the purchase of all Aggregate Shares in this Offer, Mr. Seidman will beneficially own more than 50% of our voting stock. As a result, these persons will be able to exercise significant control over all matters requiring stockholder approval, including the election of directors and the approval of significant corporate transactions, which could delay or prevent someone from acquiring or merging with us. The interests of our officers and directors, when acting in their capacity as stockholders, may lead them to:
> - vote for the election of directors who agree with the incumbent officers' or directors' preferred corporate policy; or
> - oppose or support significant corporate transactions when these transactions further their interests as incumbent officers or directors, even if these interests diverge from their interests as stockholders per se and thus from the interests of other stockholders.[24]

---

[21] *Id.* ¶ 34.

[22] Negative information like the loss of a customer was explained, but positive information like the $20 million lump payment was not explained.

[23] *Id.* ¶ 23.

[24] *Id.* ¶ 36.

The OTP did not disclose how many shares or what percentage of outstanding shares Seidman, or the other Individual Defendants, owned.

The OTP provided for proration of repurchased shares if more than 7,407,407 shares were tendered. Defendants told stockholders that the Company would repurchase the first 25,000 shares that any stockholder tendered, but that if more than 7,407,407 total shares were tendered, all excess shares would be prorated. Nonetheless, Defendants "reserve[d] the right, in [their] sole discretion, to purchase more than 7,407,407 shares of Common Stock pursuant to the Offer."[25]

Finally, as with LRN's self-tender in 2011, Defendants included boilerplate release language, allegedly to discourage stockholders from holding them accountable, in the 2017 Self-Tender's letter of transmittal.

The 2017 Self-Tender closed on November 17, 2017. Stockholders tendered 9,092,278 shares, representing roughly 23% of LRN's 39,705,818 issued and outstanding shares.[26] The board did not prorate and instead accepted all tendered shares. Plaintiff held 211,502 shares of LRN common stock and tendered all of

---

[25] D.I. 12, Ex. 1 at i.

[26] The OTP provided two charts purporting to predict the percentage of outstanding equity LRN would purchase. The charts disclosed that the 2017 Self-Tender would repurchase a maximum of 11.4% of LRN's total equity, disclosed as including treasury stock. The charts did not directly disclose how much of LRN's total outstanding equity would be purchased in the 2017 Self-Tender of 7,407,407 shares, which was 18.7%. Due to the decision not to prorate, the 9,092,278 shares repurchased equaled 22.8% of LRN's outstanding equity.

12

those shares in the 2017 Self-Tender. Because the board did not prorate, all of Plaintiff's shares were cashed out.

Neither the Individual Defendants nor LRN's other officers participated in the 2017 Self-Tender. To the contrary, the 2017 Self-Tender materially increased the value of the Individual Defendants' undisclosed LRN holdings and their equity stake in the Company. After the 2017 Self-Tender, Seidman had near-total control over LRN.

Approximately one year later, Defendants completed the final step in their alleged scheme to squeeze out LRN stockholders for the Individual Defendants' financial benefit. On November 27, 2018, LRN informed its remaining stockholders that it had agreed to be acquired by Leeds Equity Partners ("Leeds") for approximately $255 million, or $7.00 per share (the "Merger" or "Leeds Transaction"). Seidman, as LRN's controlling stockholder, approved the Merger by written consent. He used his control to negotiate other unique personal benefits through the Merger, including a spin-off of an LRN business to a company he completely controlled, and the right to sit as chairman and appoint two additional members to LRN's post-close board. Seidman is expected to appoint Lederhausen to one of those positions.

Plaintiff alleges that the Leeds Transaction was underway at the time Defendants initiated the 2017 Self-Tender. But according to the Leeds Transaction

13

merger notice sent to stockholders (the "Merger Notice"), "[i]n the spring of 2018, without soliciting or approaching any potential buyers, the Company received expressions of interest from potential buyers."[27] LRN claims it engaged GCA Advisors, LLC on April 6 to "respond to the expressions of interest and to explore the Company's strategic options."[28] Plaintiff alleges that Defendants purposefully drafted the Merger Notice to conceal material facts concerning the timing of the sale process because they knew stockholders who tendered only a portion of their shares in the 2017 Self-Tender would receive the Merger Notice. Defendants disclosed very little information about the Merger, allegedly in an effort to keep stockholders who tendered in the 2017 Self-Tender in the dark.

Defendants provided Leeds with greater, more detailed, and more current financial information about the Company's historical and projected performance than they provided to stockholders in the 2017 Self-Tender. For the Merger, LRN was valued at $255 million, resulting in payment of $7.00 per share. As controlling stockholder, Seidman received a majority of the Merger consideration. The Merger Notice disclosed that Seidman was cashing out over 80% of his shares and rolling the remainder into the post-close company. The rollover value of Seidman's shares

---

[27] Compl. ¶ 42 (alteration in original).

[28] *Id.*

14

was $32 million, which means he received approximately $128 million in cash for his other LRN shares.

The Individual Defendants also cashed out their shares in the Merger at a higher price than offered in the 2017 Self-Tender. As alleged, the Individual Defendants reaped the benefits of the unfair 2017 Self-Tender by first increasing their equity stake and control over the Company, and then consummating the Merger at $7.00 per share, thereby obtaining millions of dollars of additional consideration at the expense of the Class.

## II. ANALYSIS

Plaintiff claims that the 2017 Self-Tender was coercive, that material information relating to the transaction was inadequately disclosed, that the Individual Defendants breached their fiduciary duties, and that the 2017 Self-Tender was not entirely fair. Count I alleges that the Individual Defendants breached their fiduciary duties by issuing a materially misleading and incomplete OTP and related documents in connection with the 2017 Self-Tender. Count II alleges that the Individual Defendants breached their fiduciary duties by launching a coercive tender offer. Count III alleges that the Individual Defendants breached their fiduciary duties by conducting a self-interested and unfair 2017 Self-Tender. On behalf of all stockholders who tendered, Plaintiff seeks damages or other equitable relief from

15

the Individual Defendants, asking that they disgorge their profits and alleged ill-gotten gains. Defendants have moved to dismiss for failure to state a claim.

The standard for dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established.[29] In considering this motion, I must accept as true all well pleaded facts and inferences that can reasonably be drawn therefrom. "[D]ismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[30] A motion to dismiss will be granted only if "it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading."[31] That determination is generally limited to the factual allegations contained in the complaint and documents integral thereto.[32]

"By its very nature and form, a tender offer is normally regarded as a voluntary transaction."[33] But self-tenders have "built-in conflicts of interest between the fiduciaries responsible for conducting the offer and the stockholders to whom the offer is directed."[34] "The interest of the corporate offeror (*qua* buyer) is to pay

---

[29] *Feldman v. Cutaia*, 2006 WL 920420, at *7 (Del. Ch. Apr. 5, 2006).

[30] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 897 (Del. 2002) (quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del. 1982)).

[31] *Feldman*, 2006 WL 920420, at *7.

[32] *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2; *Feldman*, 2006 WL 920420, at *7.

[33] *Eisenberg v. Chi. Milwaukee Corp.*, 537 A.2d at 1051, 1056 (Del. Ch. 1987).

[34] *Id.* at 1057.

the lowest price possible; the interest of the stockholders (*qua* sellers) is to receive as high a price as possible."[35] In such circumstances, "[t]he directors are acting both as the representatives of the corporate offeror and as fiduciaries for the shareholder-offerees. That dual role necessarily gives rise to a potential conflict of the directors, which calls for procedural protections for the stockholders whose interests may not be adequately represented."[36]

When self-tendering, directors must structure the offer non-coercively and disclose all material facts.[37]

> [A] tender offer—particularly one made by a corporation for its own shares—may be voluntary in appearance and form but involuntary as a matter of reality and substance. Thus far two classes of situations have arisen that have been found to deprive a tender offer of its voluntary character: (i) cases involving materially false or misleading disclosures made to shareholders in connection with the offer . . . and (ii) cases where the offer, by reason of its terms or the circumstances under which it is made, is wrongfully coercive.[38]

"The standard applicable to the plaintiff's claim of inequitable coercion is whether the defendants have taken actions that operate inequitably to induce the

---

[35] *Id.*

[36] *Id.*

[37] *Pfeffer v. Redstone*, 2008 WL 308450, at *7 (Del. Ch. Feb. 1, 2008), *aff'd,* 965 A.2d 676 (Del. 2009).

[38] *Eisenberg*, 537 A.2d at 1056; *see also Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 39–40 (Del. 1996).

[stockholders] to tender their shares for reasons unrelated to the economic merits of the offer."[39]

Delaware does not apply entire fairness where there is a voluntary, non-coercive offer by the corporation to acquire its own shares.[40] But entire fairness applies where the self-tender is coercive or where the company's directors are interested or lack independence in approving the transaction.[41] Such circumstances support a claim for the individual defendants' breach of the duty of loyalty in deciding to launch the self-tender.[42]

Accepting Plaintiff's allegations as true, I conclude he has pled facts sufficient to state a claim that the Individual Defendants breached their duties of disclosure in relation to the 2017 Self-Tender. As alleged, those disclosure deficiencies, as well as structural components of the 2017 Self-Tender, rendered it coercive. Because Plaintiff has successfully alleged that the 2017 Self-Tender was coercive and that

---

[39] *Eisenberg*, 537 A.2d at 1061 (citing *Ivanhoe P'rs v. Newmont Mining Corp.*, 533 A.2d 585, 605 (Del. Ch.), *aff'd* 535 A.2d 1334 (Del. 1987)); *accord Gradient OC Master, Ltd. v. NBC Univ., Inc.*, 930 A.2d 104, 119 (Del. Ch. 2007) ("[A] shareholder is actionably coerced when he is forced into 'a choice between a new position and a compromised position' for reasons other than those related to the economic merits of the decision." (quoting *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 621 (Del. Ch. 1999))).

[40] *Pfeffer*, 2008 WL 308450, at *7.

[41] *Id.*; *Feldman*, 2006 WL 920420, at *6.

[42] *See Solomon*, 672 A.2d at 39–40; *Pfeffer*, 2008 WL 308450, at *7; *Feldman*, 2006 WL 920420, at *6; *In re Limited, Inc.*, 2002 WL 537692, at *7 (Del. Ch. Mar. 27, 2002); *Eisenberg*, 537 A.2d at 1056.

18

the Individual Defendants are interested in the transaction, the 2017 Self-Tender is subject to entire fairness review.

**A.** **Plaintiff Has Pled That Individual Defendants Breached Their Duties Of Disclosure In Connection With The 2017 Self-Tender.**

Here, Plaintiff alleges the Individual Defendants intentionally concealed material facts from stockholders concerning LRN's value, the prospect of a sale, LRN's recent performance, the Appraisal, the receipt of $20 million outside the ordinary course of business, and spring-loaded 2017 Options issued to insiders. Plaintiff further contends that the 2017 Self-Tender's stated purpose, to share the benefit of the extraordinary lump sum in a liquidity event, was materially misleading. Plaintiff alleges that complete and accurate information was reasonably available to Defendants, and therefore should have been disclosed in the OTP. Plaintiff has stated a claim for breach of the Individual Defendants' duty of disclosure, and the alleged disclosure deficiencies support a claim that the 2017 Self-Tender was coercive.

"Corporate directors owe a fiduciary duty to their stockholders to disclose all facts material to the transaction in an atmosphere of entire candor."[43] "[W]hen fiduciaries undertake to describe events, they must do so in a balanced and accurate

---

[43] *Eisenberg*, 537 A.2d at 1057 (citing *Smith v. Van Gorkom*, 488 A.2d 858, 890 (Del. 1985), and *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del. 1977)).

fashion, which does not create a materially misleading impression."[44]  "Where a corporation tenders for its own shares, the exacting duty of disclosure imposed upon corporate fiduciaries is even 'more onerous' than in a contested offer.  That is because in a self-tender, the disclosures are unilateral and not counterbalanced by opposing points of view."[45]  "A related reason for requiring the strictest possible standard of disclosure is that corporate self-tenders, by their very nature, involve built-in conflicts of interest . . . ."[46]

"Corporate fiduciaries can breach their duty of disclosure under Delaware law . . . by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading."[47]  Where defendants

---

[44] *Pfeffer*, 2008 WL 308450, at *13 (quoting *Clements v. Rogers*, 790 A.2d 1222, 1240 (Del. Ch. 2001)).

[45] *Eisenberg*, 537 A.2d at 1057 (quoting *Blanchette v. Providence & Worcester Co.*, 428 F. Supp. 347, 356 (D. Del. 1977)).

[46] *Id.*

[47] *Pfeffer*, 2008 WL 308450, at *8 (omission in original) (quoting *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 916 (Del. Ch. 1999)).  The standards for each type of breach vary slightly.  In *Redstone*, Vice Chancellor Lamb analyzed Plaintiff's specific allegations as to each type of disclosure breach. *See id.* at *8–13.  Plaintiff has pled that the disclosures in the offering materials were deficient in numerous respects.  Thus, as in *Feldman* and *Eisenberg*, I do not apply a particular standard at this juncture, but instead ask only whether the Individual Defendants failed to disclose all facts material to the tender offer. *See Feldman*, 2006 WL 920420, at *8; *Eisenberg*, 537 A.2d at 1057–61.  Whether that failure should be categorized as a materially false statement, omission, or partial, misleading disclosure will be developed through discovery and need not be determined at this stage.

20

inadequately disclose all material information related to a self-tender, the self-tender

is coercive.[48]  Our Court requires

> [a] showing of substantial likelihood that under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.  Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information available.[49]

As the Delaware Supreme Court stated in *Loudon v. Archer–Daniels–Midland Co.*,

"[a] claim based on disclosure violations must provide some basis for a court to infer

that the alleged violations were material."[50]  Materiality allegations "need not be

pleaded with particularity," as plaintiffs need only provide "some factual basis . . .

from which the Court can infer materiality of an identified omitted fact."[51]  This

inquiry is fact-intensive, and the Court should deny a motion to dismiss when

developing the factual record may be necessary to make a materiality

determination.[52]

---

[48] *Eisenberg*, 537 A.2d at 1056–1057; *see also Solomon*, 672 A.2d at 39–40.

[49] *Eisenberg*, 537 A.2d at 1057 (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)); *accord TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

[50] 700 A.2d 135, 146 (Del. 1997); *accord Pfeffer*, 2008 WL 308450, at *8.

[51] *Loudon*, 700 A.2d at 146.

[52] *See, e.g.*, *McMullin v. Beran*, 765 A.2d 910, 926 (Del. 2000) (reversing order granting defendants' motion to dismiss because "[w]hen a complaint alleges disclosure violations, courts are required to decide a mixed question of fact and law" and because "[i]n the specific context of this case, an answer to the complaint, discovery and a trial may all be necessary to develop a complete factual record before deciding [materiality] . . . as a matter of law"); *Wells Fargo & Co. v. First Interstate Bancorp.*, 1996 WL 32169, at *10 (Del.

Plaintiff has alleged three categories of deficient information that, in *Eisenberg v. Chicago Milwaukee Corporation*, were material at the motion to dismiss stage: offer purpose, price fairness, and director interestedness.[53] First, *Eisenberg* held that stockholder offerees "are entitled to an accurate, candid presentation of why the self-tender offer is being made."[54] Where, considering the offering materials as a whole, the stated purpose of the offer is materially misleading or where the stated purpose can give more than one inaccurate impression, the plaintiff alleges a claim for breach of the duty of disclosure.[55] Here, Plaintiff has successfully alleged that the OTP's disclosures relating to the "liquidity" purpose "served not to enlighten but to obscure the real reasons motivating the Offer."[56] Plaintiff alleges that the true purpose was to squeeze out LRN stockholders and buy Seidman control, and ultimately enable the Individual Defendants to cash out at a

---

Ch. Jan. 18, 1996) (declining to rule that an omission was immaterial as a matter of law because "[a] question of materiality is difficult to treat as a question of law on a motion to dismiss," and "[i]n fact, issues of materiality are generally held to be mixed questions of law and fact, but predominantly questions of fact" and "are matters that in many instances require a rich factual context to responsibly decide" (citing *TSC Indus.*, 426 U.S. at 450 )); *Branson v. Exide Elecs. Corp.*, 1994 WL 164084, at *3 (Del. Apr. 25, 1994) (TABLE) (finding that questions of materiality "generally cannot be resolved on a motion to dismiss, but rather . . . must be determined after the development of an evidentiary record").

[53] 537 A.2d at 1058–61.

[54] *Id.* at 1059 (citing *Blanchette*, 428 F. Supp. at 354–55).

[55] *Id.* at 1058–59.

[56] *Id.* at 1059.

higher value in an undisclosed forthcoming transaction. At this stage, I accept as these allegations as true.

Defendants' alleged obfuscation of the 2017 Self-Tender's true purpose also colors their inadequate disclosures of the $20 million lump sum and LRN's financials. It is reasonably conceivable that the Individual Defendants concealed information about LRN's financials and about the $20 million payment to bolster the stated purpose of sharing found money in a liquidity event. The OTP did not provide sufficient financials to allow stockholders to determine whether LRN was in a position to provide stockholders with liquidity at that time. The OTP instructed stockholders to rely solely on the limited and dated information therein; failed to provide reliable information about LRN's performance; included two pages of stale financial information that stockholders were directed not to rely on; and included disclaimers that ultimately forced stockholders to rely on financial statements from 2014 and 2015.

While the OTP disclosed the cash injection and that it was excluded from the Appraisal, the OTP did not disclose how or why the Company acquired those funds. As alleged, LRN obtained the $20 million for the sole purpose of completing the 2017 Self-Tender, as one of multiple steps to squeeze out LRN stockholders at a meager price. The disclosure deficiencies regarding the $20 million and LRN's

23

financials are material as alleged because they supported, or made more credible, the misleading stated purpose for the 2017 Self-Tender.

Second, Plaintiff contends that the $1.35 offer price is unfair and that the disclosures relating to that price were intended to, and did, obscure that fact. "If that were the case, the disclosures would clearly be defective. Shareholders are entitled to be informed of information in the fiduciaries' possession that is material to the fairness of the price."[57] Accepting Plaintiff's allegations as true, the OTP fell short. Defendants explicitly stated that the price was not a determination of "fair market value" and that the shares could be worth "substantially more" or "substantially less" than $1.35.[58] Defendants disclosed their belief that the offer price was "reasonable and appropriate,"[59] while at the same time making no recommendation on whether stockholders should tender and abstaining from tendering themselves.[60] The OTP failed to disclose material facts to explain those conclusions.[61]

---

[57] *Id.* (citations omitted) (citing *Kahn v. U.S. Sugar Corp.*, 1985 WL 4449, at *14 (Del. Ch. Dec. 10, 1985); *Joseph v. Shell Oil Co.*, 482 A.2d 335, 342 (Del. Ch. 1984); *Lynch*, 383 A.2d at 281).

[58] D.I. 12, Ex. 1 at 2.

[59] Compl. ¶ 28.

[60] *See Eisenberg*, 537 A.2d at 1055, 1059–60 (permitting disclosure claim to proceed where "[a]lthough the Offer to Purchase disclosed the opinion of . . . the Board of Directors that the $55 offering price was fair, that document also admonished that neither CMC nor its directors were making any recommendation as to whether or not the Preferred shareholders should tender").

[61] *See Frank v. Arnelle*, 1998 WL 668649, at *6 (Del. Ch. Sept. 16, 1998), *aff'd,* 725 A.2d 441 (Del. 1999); *Eisenberg*, 537 A.2d at 1060.

Had the foregoing facts been disclosed, shareholders would have been given a more even-handed presentation of the economic merits of the Offer. The need for such a presentation would appear even more essential, because the directors had concluded that the Offer was ["reasonable and appropriate"], yet decided not to recommend that their shareholders tender into it.[62]

The OTP disclosed only that the $1.25 share price was based on the May 2017 Appraisal. But the OTP did not disclose the basis or methodology for the valuation other than the exclusion of the $20 million lump sum. This, too, went unexplained. The OTP disclosed the Appraisal was conducted for tax purposes and was used in issuance of stock options. When stockholders received the OTP, they were unaware that Defendants had recently issued the 2017 Options. Rather, stockholders believed that LRN had not granted options since 2008. The OTP did not reconcile this belief and the 2017 Options, rendering the OTP's Appraisal statements misleading.

Finally, the OTP did not adequately disclose that the Individual Defendants were interested in the 2017 Self-Tender.[63] As this Court stated in *Eisenberg*, "an issuer making a tender offer for its own shares is the most inside of insiders and the

---

[62] *Eisenberg*, 537 A.2d at 1060; *see* Compl. ¶ 28. In *Eisenberg*, the directors disclosed their belief that the price was "fair." 537 A.2d at 1059. While the facts of this case differ, I do not find the Defendants' determination that the price was "reasonable and appropriate" to be a means of circumventing fiduciaries' onerous duty of disclosure in the self-tender context. *Eisenberg* does not stand for the proposition that fiduciaries must disclose all material facts related to price when they determine the price is "fair." Rather, *Eisenberg* stands for the proposition that when fiduciaries speak, they must do so completely and candidly, and that their duty is even more exacting when facing the inherent conflicts created in a self-tender.

[63] *Eisenberg*, 537 A.2d at 1060–61.

insider par excellence."[64]  "In the instant case the [Individual Defendants] were not only in a sense insiders but in their capacity as officers and directors of [LRN] were fiduciaries for the stockholders."[65]  Taking as true that the Individual Defendants were interested in the 2017 Self-Tender, they faced "the heavy responsibility of advising the stockholders fully and impartially about the advantages and disadvantages of the tender, especially in view of the personal interest which the [Individual Defendants] had in the success of the offer."[66]

The OTP disclosed that the transaction would give Seidman a controlling position in the Company, that LRN's directors and officers were not tendering, and that the board and management may pursue transactions in the future under which their interests may diverge from those of the remaining stockholders.  But in light of Plaintiff's theory of the case, these disclosures were misleading and incomplete.  Plaintiff has alleged that the Individual Defendants owned a significant amount of LRN stock and options, including the 2017 Options, which they desired to cash out in the pending Leeds Transaction.  The OTP failed to disclose the number of shares and options held by the Individual Defendants, and most importantly failed to

[64] *Id.* at 1057 (internal quotation marks omitted) (quoting *Blanchette*, 428 F. Supp. at 356). In Section II(C), *infra*, I conclude Plaintiff has pled the Individual Defendants were interested in the 2017 Self-Tender.

[65] *Id.* (quoting *Blanchette,* 428 F. Supp. at 356).

[66] *Id.* (quoting *Blanchette,* 428 F. Supp. at 356).

disclose that they would not tender in the offer because they planned to sell in the Leeds Transaction at a much higher price. The 2017 Self-Tender would make that transaction more lucrative for the Individual Defendants. The LRN "shareholders were entitled to know that certain of their fiduciaries had a self-interest that was arguably in conflict with their own, and the omission of the fact was material."[67] As alleged, the Individual Defendants failed to discharge their disclosure responsibilities as interested fiduciaries.

Defendants contend that they had no duty to disclose the alleged secret strategic sales process because it was immaterial as a matter of law.[68] In support, Defendants point out Plaintiff has not pled that the purported strategic process was "anything more than preliminary,"[69] and argue it was immaterial because "[i]nformation about a possible merger or similar transaction generally becomes material when there is an 'agree[ment] on the price and structure of the transaction.'"[70] Further, Defendants contend that Plaintiff's alleged timeline is contradicted by the Merger Notice.

---

[67] *Id.* at 1061.

[68] D.I. 12 at 23–30.

[69] *Id.* at 27 (quoting *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *58 (Del. Ch. Sept. 4, 2014) (subsequent history omitted)).

[70] *Id.* at 26 (alteration in original) (quoting *In re Nine Sys.*, 2014 WL 4383127, at *57).

Defendants correctly state the law on this point. But without the benefit of discovery, Defendants' materiality arguments are premature. "A question of materiality is difficult to treat as a question of law on a motion to dismiss."[71] Plaintiff alleges that, when Defendants commenced the 2017 Self-Tender, they were in the midst of discussing a strategic process and had received an offer. The details of those discussions and the offer are unknown at this stage, precisely because Plaintiff alleges Defendants purposefully withheld this information from stockholders. Nonetheless, at this stage, I can reasonably infer from Plaintiff's allegations that the process was more than preliminary. Whatever level of interest prospective buyer(s) demonstrated was sufficiently concrete to inspire Defendants to take measures to reap additional benefits for themselves, to stockholders' detriment. That offer or overture materialized in the Leeds Transaction. As for the conflicting Merger Notice, when Plaintiff was cashed out in the 2017 Self-Tender, his access to LRN's information became even more restricted. The Merger Notice was Plaintiff's only source of information regarding the Leeds Transaction, and, consistent with his theory of the 2017 Self-Tender, Plaintiff alleges that it too contains materially false and misleading information.

---

[71] *Wells Fargo & Co.*, 1996 WL 32169, at *10 (declining to rule that an omission was immaterial as a matter of law and noting that "[i]n fact, issues of materiality are generally held to be mixed questions of law and fact, but predominantly questions of fact").

28

Plaintiff has alleged material omissions related to the undisclosed strategic process. Plaintiff alleges that Defendants historically wronged stockholders; intended to squeeze out stockholders at an unfair price through the 2017 Options, Appraisal, and 2017 Self-Tender; and intended to take as many of the benefits from the Leeds Transaction as they could. Considering those allegations, the identified omissions likely would have altered the "total mix" of information available when considering the 2017 Self-Tender and likely "would have assumed actual significance in the deliberations of the reasonable shareholder."[72] At a minimum, Plaintiff's theory of the case leads to the conclusion that determining whether Defendants' identified omissions are "immaterial" is fact-intensive and should be developed through discovery.[73] "[T]he court will not dismiss the plaintiff's disclosure claims at this early stage of the litigation, before the basic facts relating to the challenged transactions . . . are established of record."[74]

And as I have found, Plaintiff has adequately alleged that the omitted information of purpose, the source of funds, the reasonableness of the offer, and

---

[72] *Eisenberg*, 537 A.2d at 1057 (quoting *Rosenblatt*, 493 A.2d at 944); *see also TSC Indus.*, 426 U.S. at 449.

[73] *See McMullin*, 765 A.2d at 926; *Wells Fargo & Co.*, 1996 WL 32169, at *10; *Branson*, 1994 WL 164084, at *3.

[74] *Feldman*, 2006 WL 920420, at *8.

interestedness were material under *Eisenberg*.[75]  At the motion to dismiss stage, I

need not determine whether each disclosure deficiency, alone, is sufficient to find a

[75] Defendants also contend that they had no duty to disclose additional information about the Appraisal or LRN's recent performance, citing a number of cases that found appraisals for tax purposes immaterial.  D.I. 12 at 30–36.  Those cases are inapposite here.  For example, Defendants cite *Frank v. Arnelle* for the proposition that "Delaware courts do not require mandatory disclosure of valuation opinions prepared in connection with a board's approval of a self-tender offer."  *Frank*, 1998 WL 668649, at *6.  But Defendants omit the context for that statement.  Chancellor Chandler went on to explain that "it is settled under our decisional law that where a board is *not obligated* to offer or pay a fair price, *absent any materially misleading disclosures*, it is neither required to disclose to its stockholders the pricing methodology nor an investment bank fairness opinion, including valuations." *Id.* (emphasis added).  In that case, he found that "the terms of the Offer to Purchase would have made it clear to a reasonable stockholder that the auction price range was market driven" and that there were no disclosure violations that triggered the board's duty to offer a fair price.  *Id.*  Further, *Frank* was decided at the summary judgment stage, after the parties developed the record as to materiality.

With regard to additional information about LRN's performance, Defendants argue Plaintiff has failed to demonstrate why "the additional granularity he seeks is anything more than helpful or cumulative to the information already disclosed," D.I. 12 at 34 (quoting *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *12 (Del. Ch. June 30, 2014)), or why he needs such immaterial "soft information."  *Id.* at 31 (quoting *Olenik v. Lodzinski*, 208 A.3d 704, 720 n.79 (Del. 2019)).  To the contrary, Plaintiff has pled why he needed that information in considering the "total mix" when deciding to tender.  *See Eisenberg*, 537 A.2d at 1057, 1059–60.

Further, Defendants claim that Plaintiff's disclosure claim is based, at least in part, on information that did not exist, and contend "Plaintiff does not allege that more current or more accurate financial information even existed."  D.I. 12 at 30 (citing *In re JCC Hldg. Co., Inc.*, 843 A.2d 713, 721 (Del. Ch. 2003) ("Under Delaware law, there is no obligation on the part of a board to disclose information that simply does not exist . . . .")).  I disagree. By pointing out the paucity and age of the financials stockholders were given, and by alleging the 2017 Self-Tender and OTP were timed to precede formal preparation of the 2016 financials, Plaintiff has pled Defendants had more current and complete financial information that could have been provided to stockholders.

Finally, Defendants claim they had no duty to disclose additional details regarding the one-time, $20 million payment, claiming they had no duty to provide stockholder with an "avalanche of trivial information."  *Id.* at 36 (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *13 (Del. Ch. May 4, 2005), *aff'd,* 897 A.2d 162

breach. Rather, I look at the disclosure allegations collectively.[76] "All of those disclosure items, when taken together and considered against the background of the transaction, clearly demonstrate that the defendants have not met their disclosure obligations under Delaware law."[77] Defendants' arguments do not disturb that conclusion.

Those material inadequacies are sufficient for Count I to state a claim. Furthermore, those inadequacies mandate denying the Motion on Count II because "actionable coercion may inhere in either the disclosures or in the terms of the offer itself."[78] Despite Defendants' contentions that they prudently and cautiously made disclosures in the OTP, reading those disclosures collectively under the circumstances alleged, they were designed to induce stockholders to tender.[79] Those disclosures rendered the 2017 Self-Tender "voluntary in appearance and form but involuntary as a matter of reality and substance."[80] Accordingly, the OTP's

---

(Del. 2006)). Plaintiff has pled that further information about the $20 million cash injection would have altered the total mix of information available in deciding whether to tender. Ultimately, under the alleged circumstances, I follow *Eisenberg's* mandate holding Defendants to their more exacting duty of disclosure that required them to disclose all facts necessary for the stockholder to understand the $1.35 price and the 2017 Self-Tender's purpose, including information about the Appraisal and the one-time, $20 million payment.

[76] *Eisenberg*, 537 A.2d at 1058 (citing *Joseph*, 482 A.2d at 343).

[77] *Id.* (citing *Joseph,* 482 A.2d at 343).

[78] *Id.* at 1056 n.7.

[79] *Id.* at 1062.

[80] *Id.* at 1056.

materially incomplete disclosures mandate that I deny the Motion to dismiss Counts I and II with respect to the Individual Defendants.

## B. Plaintiff Has Pled The 2017 Self-Tender Was Structurally Coercive.

Although Defendants' disclosure deficiencies are sufficient to state a claim for a coercive self-tender, Plaintiff has also stated a coercion claim by alleging that 2017 Self-Tender was structurally coercive. The Court has found actionable coercion where the plaintiff "is forced into a choice between a new position and a compromised position,"[81] and where, under the circumstances, stockholders may have perceived, "not unreasonably, that unless they tender, they may not realize any return on or value for their investment in the foreseeable future."[82]

As alleged, four aspects of the 2017 Self-Tender' terms and circumstances contributed to Plaintiff's reasonable belief that he would receive little or no return on his LRN investment unless he tendered, ultimately forcing Plaintiff to choose between being cashed out at a low price or remaining a stockholder in a controlled company with a troubled transactional history and bleak prospects for a future liquidity event.[83]

---

[81] *Gradient OC Master, Ltd.*, 930 A.2d at 119 (internal quotation marks omitted) (quoting *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d at 621).

[82] *Eisenberg*, 537 A.2d at 1061.

[83] *See id.*

First, Plaintiff has alleged that the Company's dealings with its stockholders preceding the 2017 Self-Tender, including its history of executing transactions with inadequate disclosures at arbitrary and declining prices, rendered the 2017 Self-Tender coercive. LRN is a private company, so there was no market-based exit for stockholders or market price to test the offer price's adequacy. The Company had not held stockholder meetings to give stockholders a vote on corporate matters, including director elections and certificate amendments; provided only limited and stale financial information; and failed to provide notice of potentially conflicted transactions. In this context, the Company also repeatedly granted cheap options and repurchased shares at arbitrary and declining prices, despite improving performance. It is reasonably conceivable that stockholders were "coerced into accepting the unfair $1.35 per share because of Defendants' prior conduct of offering less and less in tender offers while having no basis for the prices."[84]

Second, the OTP framed the 2017 Self-Tender as the last opportunity for stockholders to avoid a total loss on their investment. Defendants presented the 2017 Self-Tender as a fleeting liquidity event, made possible by an unexplained $20 million cash injection outside the ordinary course. The OTP warned stockholders there was no market for LRN stock and that the 2017 Self-Tender may provide the only exit for some time. And the OTP warned stockholders that the post-close

---

[84] Compl. ¶ 3.

controller, directors, and officers would not hesitate to pursue their own interests in the future, even if they diverged from the stockholders' interests. Defendants' disclosure was consistent with the Company's history of entering transactions in an effort to increase the Individual Defendants' equity stake over time. In view of LRN's historic transactions, lack of a market for LRN stock, and the OTP's statement that stockholders might "never receive cash or other payment for your Common Stock if you do not take the Offer,"[85] it is reasonably conceivable that LRN stockholders tendered to achieve a measure of liquidity with respect to their investment, even at an inadequate price. As alleged, LRN stockholders were wrongfully coerced to tender for reasons unrelated to the economic merits of the transaction.

Third, the Individual Defendants structured the 2017 Self-Tender so that the shares that did not tender would be worth less or exposed to greater risk.[86] This Court has found wrongful coercion in such cases.[87] Defendants disclosed that, after the 2017 Self-Tender, Seidman would have near total control over LRN and that the interests of LRN's directors and officers "may lead them to . . . oppose or support

---

[85] *Id.* ¶ 24.

[86] *See, e.g.*, *Gradient OC Master, Ltd.*, 930 A.2d at 119, 121, 126; *AC Acqs. Corp. v. Anderson, Clayton & Co.*, 519 A.2d 103, 113–14 (Del. Ch. 1986); *Eisenberg*, 537 A.2d at 1061–62; *Kahn*, 1985 WL 4449, at *3–4.

[87] *See, e.g.*, *Gradient OC Master, Ltd.*, 930 A.2d at 119, 121, 126; *AC Acqs. Corp.*, 519 A.2d at 113–14; *Eisenberg*, 537 A.2d at 1061–62; *Kahn*, 1985 WL 4449, at *3–4.

significant corporate transactions when these transactions further their interests as incumbent officers or directors, even if these interests diverge from their interests as stockholders per se and thus from the interests of other stockholders."[88] This forced stockholders to face a coercive choice:[89] either tender at an unexplained price, or risk retaining their interest in a company controlled by a self-interested fiduciary.

Finally, Plaintiff has alleged that the 2017 Self-Tender's proration plan was coercive under the circumstances. The OTP provided for proration of repurchased shares if more than 7,407,407 shares were tendered. Facing proration, LRN stockholders tendered more shares in order to receive the greatest possible return in what Defendants represented as a fleeting, one-time liquidity event: the 2017 Self-Tender was oversubscribed. The board did not prorate and instead accepted all 9,092,278 tendered shares. Defendants disclosed their right to do so; the OTP stated that LRN reserved the right to purchase a greater number of shares. While proration of this kind may be a valid exercise of business judgment in ordinary circumstances,

---

[88] Compl. ¶ 36.

[89] *See Gradient OC Master, Ltd.*, 930 A.2d at 119 ("Keeping the shareholders in the 'same' position, then, does not require an 'identical' position, economic or otherwise. Instead, a shareholder is actionably coerced when he is forced into 'a choice between a new position and a compromised position' for reasons other than those related to the economic merits of the decision. (quoting *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d at 621)); *see also AC Acqs. Corp.*, 519 A.2d at 114; *Eisenberg*, 537 A.2d at 1061–62.

Plaintiff's allegations render the 2017 Self-Tender's proration term suspicious.[90] By choosing not to prorate, Defendants were able to buy out a greater percentage of LRN's outstanding shares, bolstering Seidman's control and increasing the Individual Defendants' equity in the Company. Under the totality of circumstances alleged, it is reasonably conceivable LRN's intended proration coerced stockholders to tender more shares than they otherwise would have because proration could reduce the number of shares actually repurchased.[91]

The 2017 Self-Tender allowed Seidman to extract control for himself; subjected non-tendering stockholders to the risk of becoming minority stockholders under Seidman, who disclosed his and his fellow fiduciaries' divergent interests; subjected stockholders to the risk that any future liquidity opportunity would be worse, as supported by LRN's history of similar transactions, or perhaps even nonexistent; and squeezed more shares out of each tendering stockholder by invoking proration but accepting all tendered shares. Given those circumstances, LRN stockholders may have perceived, not unreasonably, that unless they tendered, they would not realize any return on or value for their investment in the foreseeable future. "In that sense the offer does have coercive aspects. And the coercion may

---

[90] *See Eisenberg*, 537 A.2d at 1061 ("If these were the only relevant circumstances (and if proper disclosure was made of all material facts), the Court would have difficulty concluding, at least on this preliminary record, that the Offer is inequitably coercive.").

[91] *See id.* at 1056 (noting that a tender offer may be "voluntary in appearance and form but involuntary as a matter of reality and substance").

be attributed, at least to some extent, to acts of the directors . . . ."[92]  Plaintiff has adequately pled that the 2017 Self-Tender was structurally coercive, and the Motion to dismiss the Individual Defendants is denied with respect to Count II.[93]

**C.**  **The 2017 Self-Tender Is Subject To Entire Fairness Review; Plaintiff Has Pled Non-Exculpated Claims.**

In this context, there are two clear avenues to trigger entire fairness review: pleading that the defendant directors structured a coercive self-tender, or pleading that the defendant directors were interested in the transaction.[94]  Defendants seek to avoid such review by contending Plaintiff has not shown the 2017 Self-Tender was involuntary and, therefore, Defendants owed no duty of fairness.  As explained, Plaintiff has pled the 2017 Self-Tender was coercive; therefore, it will be reviewed under entire fairness.[95]

The Court also applies entire fairness if the plaintiff adequately pleads that the directors approved or structured the tender offer in a way that puts their own interests above those of the stockholders.[96]  In *Feldman v. Cutaia,* this Court refused to dismiss an entire fairness challenge to a self-tender offer in which the directors were

---

[92] *Id.* at 1061.

[93] These grounds are sufficient to deny the Motion to dismiss Count II.  Other grounds may exist to support a finding of wrongful structural coercion, but I need not reach those grounds today.

[94] *See Pfeffer*, 2008 WL 308450, at *7; *Feldman*, 2006 WL 920420, at *6.

[95] *See Pfeffer*, 2008 WL 308450, at *7.

[96] *See id.*; *Feldman*, 2006 WL 920420, at *6.

alleged to have received "a financial benefit not equally shared by the company's stockholders."[97]  There, the self-tender's structure was suspect when coupled with the other circumstances surrounding the transaction, "suggest[ing] that the individual director defendants placed their own interests above those of the [company's] stockholders."[98]

The same holds true here.  Plaintiff has alleged that the Individual Defendants wanted to increase their personal benefit from selling the Company via a series of steps that included buying out LRN stockholders at a low price.  The Individual Defendants' spring-loaded 2017 Options preceded the 2017 Self-Tender.  At the time of the 2017 Self-Tender, the Individual Directors "own[ed] a significant percentage of [LRN's] voting stock."[99]  They reduced the total outstanding shares through the 2017 Self-Tender, allegedly knowing that a strategic process was underway in which LRN either received or expected to receive offers above $1.35 per share.  To receive "a disproportionate benefit from the [Leeds Transaction] than

---

[97] 2006 WL 920420, at *6.  The complaint in *Feldman* included allegations that the pricing of the exchange offer was "severely inflated" ($10 per share for a stock that never traded above $4) to allow the directors, holding 89% of the company's otherwise underwater options and warrants, to improperly enrich themselves.  *Id.* at *4. These allegations led the court to conclude that the complaint adequately alleged that the individual director defendants were interested in the transaction.  *Id.* at *6.

[98] *Id.*

[99] D.I. 12, Ex. 1 at 29.

they would otherwise have been entitled to,"[100] the Individual Defendants structured the 2017 Self-Tender to eliminate 23% of outstanding shares at a low price, on coercive terms, and with misleading disclosures, before selling their shares at $7.00 in the Merger. By approving the 2017 Self-Tender, the Individual Defendants increased their equity stake in LRN, and thereby received millions of additional consideration in the Merger that otherwise would have gone to LRN stockholders.[101] Plaintiff has adequately alleged that the Individual Defendants were interested in the 2017 Self-Tender, such that it should be reviewed under entire fairness.[102]

Further, the 2017 Self-Tender eliminated enough shares to gift Seidman free control. Seidman allegedly approved the 2017 Self-Tender to bolster his control over LRN, which he then wielded by approving the Merger, and related personal benefits, by written consent. These benefits included an asset spinoff, retaining his position as chairman, and securing two additional seats on the post-close board. It is reasonably conceivable that granting Seidman control also ensured he had the sole power to keep both Feldman and Lederhausen on the board; as alleged, Seidman

---

[100] *Feldman*, 2006 WL 920420, at *6.

[101] *Id.* The exact amount of their gain must be determined by discovery because the Individual Defendants withheld information about their stock holdings.

[102] *Eisenberg*, 537 A.2d at 1060–61. Plaintiff also alleges that the Individual Defendants were interested in the 2017 Self-Tender because they attempted to purchase a personal release of potential fiduciary duty claims in the letter of transmittal. Because Plaintiff has adequately alleged other grounds to support an inference that the Individual Defendants were interested in the 2017 Self-Tender, I need not reach this issue today.

planned to retain Lederhausen. Feldman and Lederhausen approved the 2017 Self-Tender and used LRN's money to buy Seidman control.[103] These circumstances, together with the additional Merger compensation the 2017 Self-Tender enabled each Individual Defendant to receive, support a claim that the Individual Defendants put their own interests above the stockholders' in approving and structuring the 2017 Self-Tender, such that the 2017 Self-Tender is subject to entire fairness.[104]

Having triggered entire fairness, Plaintiff has adequately alleged that the 2017 Self-Tender was the product of an unfair process and resulted in an unfair price. As evidence of unfair process, Plaintiff points to the OTP disclosures, which as discussed, were materially misleading, false, and incomplete. The Individual Defendants failed to adequately disclose the extent of their interest in the transaction and failed to enact safeguards to ensure the 2017 Self-Tender was otherwise fair to LRN stockholders.[105] Additionally, the timing was unfair as it was initiated just as LRN planned an undisclosed strategic sale process for a higher price, and before

---

[103] *See In re Limited, Inc.*, 2002 WL 537692, at *7 (holding actions of corporation's directors in unanimously approving a self-tender offer, which allegedly benefitted corporation's chief executive officer without a corresponding benefit to corporation, gave rise to cause of action by stockholders for breach of duty of loyalty, where directors were either interested or lacked independence).

[104] *Pfeffer*, 2008 WL 308450, at *7; *Feldman*, 2006 WL 920420, at *6; *In re Limited, Inc.*, 2002 WL 537692, at *7.

[105] *See, e.g.*, *Feldman*, 2006 WL 920420, at *8; *Eisenberg*, 537 A.2d at 1060–61.

LRN finalized its financial statements for 2016. Plaintiff has alleged the Individual Defendants engaged in an unfair process.

Plaintiff has also alleged that the Individual Defendants launched the 2017 Self-Tender at an unfair price. In a non-coercive tender offer, the company has no duty to pay fair price.[106] But where the Court finds coercion or director interestedness, as alleged here, the Court must look to the adequacy of the price.[107] Plaintiff has pled $1.25 was unfair. The inadequacy of this price is supported by LRN's history of arbitrary pricing; its foundation in the questionable Appraisal and incomplete and outdated financials; and the Merger's price of $7.00 per share. Further, the Individual Defendants failed to retain an advisor or obtain a fairness opinion or independent valuation for the Self-Tender. Defendants' failure to adequately disclose why or how they chose the tender offer price suggests they had an improper motive to set the price below fair value.[108]

As alleged, the Individual Defendants' choice to structure the 2017 Self-Tender for their benefit amounts to a non-exculpated breach of the duty of loyalty

---

[106] *See, e.g.*, *Solomon*, 672 A.2d at 39–40.

[107] *See, e.g.*, *id.* at 39–40; *Pfeffer*, 2008 WL 308450, at *7; *Feldman*, 2006 WL 920420, at *6.

[108] *See Feldman*, 2006 WL 920420, at *6. While Defendants argue that Plaintiff's claim must be dismissed because the OTP stated that $1.35 was not a determination of fair value, D.I. 12 at 42–44, that is insufficient to overcome the allegations that the Individual Defendants were conflicted and that the disclosure that $1.35 was a "reasonable and appropriate" price was misleading and incomplete.

that is subject to entire fairness review.[109]  Contrary to Defendants' augment,[110]  an exculpatory provision pursuant to Section 102(b)(7) cannot be grounds for dismissal at the pleading stage.[111]  The Motion to dismiss the Individual Defendants is denied with respect to Count III.[112]

### D. LRN Must Be Dismissed.

Plaintiff does not bring Counts I, II, and III against LRN.  Plaintiff brings those claims against the Individual Defendants only.  Where no claim is advanced

---

[109] *See Feldman*, 2006 WL 920420, at *6; *In re Limited, Inc.*, 2002 WL 537692, at *7, *10 n.65.

[110] D.I. 12 at 44 (citing D.I. 12, Ex. 7 at 3, and then citing *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1179–80 (Del. 2015), and *Emerald P'rs v. Berlin*, 787 A.2d 85, 91 & n.35 (Del. 2001)).

[111] *See In re Limited, Inc.*, 2002 WL 537692, at *7 (holding that, where the plaintiff alleged interestedness, directors' approval of self-tender offer gave rise to cause of action for breach of duty of loyalty); *id.* at *10 n.65 ("Defendants . . . have also sought to invoke the exculpatory charter provision adopted under the authority of 8 *Del. C.* § 102(b)(7).  To the extent that a duty of loyalty claim is implicated, that provision, of course, is inapplicable. *Malpiede v. Townson,* 780 A.2d 1075, 1094–95 (Del. 2001).  In addition, as to those defendants about whom there is no question as to their disinterestedness and independence, I am reluctant to evaluate the § 102(b)(7) defense at this stage.").

[112] *See Orman v. Cullen*, 794 A.2d 5, 20 n.36 (Del. Ch. 2002) (ruling that if entire fairness applies to a transaction, that conclusion "normally will preclude dismissal of a complaint on a Rule 12(b)(6) motion to dismiss" and that "[a] determination of whether the defendant has met [the entire fairness] burden will normally be impossible by examining only the documents the Court is free to consider on a motion to dismiss").

against a named defendant, dismissal is required.[113]  Plaintiff does not seek any relief from LRN.[114]  Accordingly, the Motion is granted on all counts with respect to LRN.

## III.  CONCLUSION

For the foregoing reasons, the Motion is DENIED with respect to the Individual Defendants and GRANTED with respect to LRN.  The parties shall submit an order implementing this decision.

---

[113] *See Lechliter v. Del. Dep't of Nat. Res. Div. of Parks & Recreation*, 2015 WL 7720277, at *2 n.17 (Del. Ch. Nov. 30, 2015).

[114] *See* Compl. at 31–32 ("Prayer for Relief").